# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2002-IA-01938-SCT

*SANDERSON FARMS INC. (PRODUCTION
DIVISION)*

*v.*

*TANYA BALLARD, RANN McGRAW AND WILLIE
McINTOSH*

| | |
|---|---|
| DATE OF JUDGMENT: | 11/22/2002 |
| TRIAL JUDGE: | HON. J. LARRY BUFFINGTON |
| COURT FROM WHICH APPEALED: | LAWRENCE COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | W. SCOTT WELCH, III |
| | ROBERT M. FREY |
| | JOE DALE WALKER |
| | JAMES LAWTON ROBERTSON |
| | HENRY E. CHATHAM, JR. |
| ATTORNEY FOR APPELLEES: | JOHN DUDLEY BUTLER |
| NATURE OF THE CASE: | CIVIL - OTHER |
| DISPOSITION: | REVERSED AND RENDERED - 10/06/2005 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

## CONSOLIDATED WITH

## NO. 2003-IA-02490-SCT

*SANDERSON FARMS, INC.*

*v.*

*KENNY AUSTIN, CHARLETT HATHORN AND
LEROY SPRING*

| | |
|---|---|
| DATE OF JUDGMENT: | 06/17/2004 |
| TRIAL JUDGE: | J. LARRY BUFFINGTON |

| | |
|---|---|
| COURT FROM WHICH APPEALED: | JEFFERSON DAVIS COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | JAMES LAWTON ROBERTSON |
| | HENRY E. CHATHAM, JR. |
| | ROBERT M. FREY |
| | W. SCOTT WELCH, III |
| | JOE DALE WALKER |
| ATTORNEY FOR APPELLEES: | JOHN DUDLEY BUTLER |
| NATURE OF THE CASE: | CIVIL - OTHER |
| DISPOSITION: | REVERSED AND RENDERED - 10/06/2005 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE WALLER, P.J., EASLEY AND CARLSON, JJ.**

**EASLEY, JUSTICE, FOR THE COURT:**

### PROCEDURAL HISTORY

¶1.    On September 26, 2000, Tanya Ballard, Willie McIntosh, and Rann McGraw, individually and as class representatives (Ballard), independent contractor broiler growers, filed suit against Sanderson Farms, Inc. (SF) in the Chancery Court of Lawrence County, Mississippi.    On August 2, 2002, Kenny Austin, Charolett N. Hathorn, and Leroy Spring, individually and as class representatives (Austin), independent contractor hatching egg growers, filed suit against Sanderson Farms, Inc. (SF) in the Chancery Court of Jefferson Davis County, Mississippi.    The Plaintiffs in both the ***Ballard*** and ***Austin*** actions were represented by the same attorneys at trial and now on appeal.    SF, however, was represented by different counsel in the two actions at trial, as well as, on appeal.    The Honorable J. Larry Buffington, Chancellor, presided over both the ***Ballard*** action and the ***Austin*** action.

¶2.    In the ***Ballard*** action**,** SF removed the case to federal court and answered the first amended complaint.    The case was remanded to the chancery court.    Ballard received leave of

2

court to file a second amended complaint. SF answered the second amended complaint and raised the following defenses: (1) that the parties had agreed to arbitrate; (2) that the circuit court, not the chancery court, had jurisdiction; and (3) that venue was improper. SF also raised the defense that Ballard's claims were barred by statute of limitations, the plaintiffs were misjoined, and the plaintiffs could not represent a class.

¶3. The trial court denied all of SF's affirmative defenses, including, arbitration, subject matter jurisdiction, venue, and statute of limitations. SF filed its petition for permission to appeal from interlocutory order and emergency motion to stay. The trial court denied the petition for certification and stay. This Court granted SF's request for interlocutory appeal. See M.R.A.P. 5.

¶4. In the *Austin* action, SF responded to the Plaintiffs' complaint filed by filing its motion to dismiss and/or to transfer jurisdiction and/or to compel arbitration and/or for change of venue. On June 7, 2004, the trial court entered its order overruling SF's motion to dismiss, transfer, compel arbitration and for change of venue. Based on SF's ore tenus motion to modify or amend the trial court's order the trial court entered its order amending the June 7th order to certify the order for interlocutory appeal in accordance with M.R.A.P. 5 (a) and stay all further proceedings pending this Court's action. This Court entered its order accepting SF's notice of appeal and dismissing the alternative petition for interlocutory appeal as moot.

¶5. This Court consolidated the *Austin* appeal with the *Ballard* appeal and stayed all trial court proceedings pending the outcome of the appeal.

**FACTS**

3

¶6.     SF, based in Laurel, Mississippi, has three operating subsidiaries: SF (Food Division), SF (Processing Division), and SF (Production Division).   The SF (Production Division) has five operating divisions in Laurel, Collins, Hazlehurst, and McComb, Mississippi, and in Bryan, Texas.   The contract growers are divided into three categories: (1) pullet growers, (2) hatching egg or breeder growers, and (3) broiler growers.

¶7.     Both the Ballard (broiler growers) and the Austin (hatching egg growers), collectively "the Plaintiffs", argue on appeal that the two cases involve claims that SF "fraudulently or negligently induced them and other similarly situated growers to enter into contracts to raise chicken flocks by making false representations about their potential incomes and the costs and requirements involved."

¶8.     In the *Austin* action, SF asserts that the introduction of long term contracts were introduced due to the growers' desire to have more financial security than provided by the flock-to-flock agreements.   Many of the concerns in the industry came before the Mississippi Legislature in 1996.   Independent of SF's process for developing new agreements with its growers, representatives of the poultry manufacturers and representatives for the growers began a series of meetings.   The Governor's Special Poultry Committee considered contract issues that were raised by producers and growers.[1]

¶9.     SF scheduled meetings with its some 600 growers, 110 of which were hatching egg growers.   Meetings with growers in each of SF's divisions were scheduled in various towns:

---

[1] SF was represented by Joe F. Sanderson, Jr., and the Mississippi Contract Poultry Growers Association (MCPGA) advocated the interests of the growers.   Larry McKnight served as the president and executive director of MCPGA.   The MCPGA also selected one contract grower with each poultry manufacturer to participate in the negotiations.

Laurel, Collins, Hazlehurst and McComb. On November 19, 1996, the Governor's Special Poultry Committee published a series of agreements on various issues. Each poultry company was to have some type of a long-term contract.

¶10. The SF growers were sent a memorandum addressed by grower spokesman, Mike Ballard, husband of Tanya Ballard, the lead plaintiff in the *Ballard* action. The memorandum advised the growers to consult an attorney to review the long-term contract before attending the meeting with SF and committing to the long-term agreement. The growers were also advised that they could bring their attorneys to the meeting. The growers were instructed to pay close attention to the questions raised about arbitration and certain phrases in the contract.

¶11. On December 30, 1996, Sanderson sent a letter to the growers inviting them to a group meeting to discuss the proposed new long-term contracts. SF asserts that each grower was sent a copy of the draft agreement, invited to consult an attorney, and bring a lawyer to the meeting. The group meetings for the hatching egg growers (Austin) regarding the new proposed contracts took place on January 15/16, 1997. The hatching egg contracts (Austin) were signed and became effective February 1, 1997. The broiler (Ballard ) contracts were signed and became effective January 1, 1997.

¶12. On appeal, SF contends, in the *Ballard* action, that the Plaintiffs' suit is an attack on vertical integration by attacking an essential part of that system, the nearly-universal (and federally-regulated) practice of ranking broiler growers on objective measures of performance and rewarding the growers that perform best. SF defines vertical integration as a system where the company/processor supplies inputs such as the chicks, the feed and medicine, furnishes technical advice, catches the chickens, transports the chickens to the processing plant,

processes the chicken, and sells the chicken. The grower/farmer supplies the chicken houses and the skilled labor. The growers' pay is based upon a competitive scale where the growers are ranked upon their standardized costs, i.e., the more efficiently a flock is grown (the lower the standard production cost per pound), the higher the grower is ranked.

¶13. SF argues that ranking is essential to provide the growers incentive to make efficient use of the company-supplied inputs in order for vertical integration to work. The growers contend that the ranking system is inherently unfair based the variances in the quality of the chickens delivered, timing of deliveries, variances in the feed delivered and increased grower's expense to modernize to compete with newer farms and include new equipment required by SF.

¶14. On appeal, SF raises various assignment of errors. However, as the Plaintiffs' claims involve the alleged fraudulent inducement or misrepresentations by SF, the following issue is dispositive of the case:

> Whether the Plaintiffs were fraudulently induced based on alleged promises made by Sanderson Farms *before* entering into a contract containing an arbitration provision.

## DISCUSSION

¶15. Both set of Plaintiffs contend that "that Sanderson Farms fraudulently or negligently induced them into housing and tending to flocks and gathering and/or storing hatch eggs by knowingly making false representations about their future income, costs, expenses, equipment requirements, company policies, and working relationships." That is, the Plaintiffs contend that SF wrongfully induced them into executing the contracts on the basis of and in reliance of fraudulent misrepresentations. As such, the Plaintiffs contend that they have suffered

6

damages. The Plaintiffs filed suit seeking injunctive relief, a full accounting and creation of a constructive trust and an equitable lien. SF argues that the Plaintiffs' allegations of fraudulent inducement and misrepresentation to enter into the contracts are barred by the statute of limitations. On appeal, the Plaintiffs contend that the statute of limitations was tolled by SF's fraudulent concealment. The Plaintiffs' allegation of concealment is solely based on the contention that SF has complete control of all data and other information concerning the ranking system that is used to defraud the Plaintiffs.

### A.    *Fraudulent Inducement/Statute of Limitations*

¶16.    The Plaintiffs contend that they were fraudulently induced by SF. In the ***Ballard*** action, the Plaintiffs allege in their complaint, filed September 26, 2000, that "the class of Plaintiffs on behalf of whom this action is brought consists of all Mississippi residents to whom, between, **on or about November 1981[,] and the present**, [the] Defendant [SF] induced into growing chickens for it and paid compensation under the so called 'ranking system.'" (emphasis added).

¶17.    Similarly, the Plaintiffs in the ***Austin*** action allege in their complaint, filed August 2, 2002, that they were damaged by SF's "systematic scheme of compensating Plaintiffs pursuant to [the] Defendant's method of payment." Specifically, the complaint alleges that "this action . . . consists of all Mississippi residents who, **between June 1993, and the present**, [the] Defendant [SF] has fraudulently and or negligently induced into housing, feeding and providing water for Sanderson's breeder flocks and gathering, grading, packing and storing the hatch eggs generated by said flocks and who have been compensated under the payment method established by the Defendant." (emphasis added).

7

¶18.    In the *Ballard* action, the Plaintiffs filed their answers to interrogatories propounded by SF. Each of the Plaintiffs were asked in Interrogatory No. 10:

> State with as much particularity as possible [including names, **dates**, places, persons present, other witnesses and pertinent documents] each and every statement, illustration, hand out or other communication whatsoever [including omissions of material facts] that you claim constituted a representation by Sanderson Farms [including the persons uttering or providing same] and which you claim was (a) false, (b) misleading, (c) known by Sanderson to be such, (d) upon which Sanderson intended for you to rely, (e) what you claim that you did or refrained from doing in reliance thereon, (f) all persons with discoverable knowledge of your reliance and (g) the manner in which you claim to have been harmed by your alleged reliance on each such representation.

(emphasis added).

¶19.    Tanya Ballard responded that her dealings with SF growing and selling chickens began in 1993. According to Tanya, she was made various promises in 1993 when she started about how much money she could make. She stated:

> I did not find out about the **ranking system** until **the first time I sold chickens**. I did not know I would be ranked against the other growers, and for me to do good my neighbor would have to do bad, along with the other growers I sold with. I didn't understand that I would be paid on feed conversion and cost, and that would determine how much I got paid per pound. I never saw a Sanderson contract until it was time to get my birds. I wasn't told that it would be possible for me to make less than $100,000 per year back in **1993**.

(emphasis added). In her affidavit, Tanya stated that she entered into her first contract with SF in or near February, 1994.

¶20.    Rann McGraw responded to the interrogatory as follows:

> Approximately **twenty years ago**, my wife and I sat down with Mr. Gibson to talk about a letter of intent and growing chickens for Sanderson Farms. Mr. Gibson pulled out papers from his desk and said that here is what one grower made, here is what another grower made and just kept on and on with some what I thought were good and reasonably high figures. . . . We thought we would have a good income, be at home and be our own boss. There were a lot of things we

8

were not told before committing to this endeavor. . . . We were not told that **we should hope our neighbors do bad, so that we can do good**.

(emphasis added). McGraw's affidavit provided that in or near November, 1982, he entered into his original contract with SF.

¶21. According to Willie McIntosh's affidavit, he entered in his original agreement with SF in or near February, 1990. McIntosh responded to Interrogatory No. 10 as follows:

> In the **early part of 1992**, my wife and I built four chicken houses under a Sanderson Farm's contract. . . . When we first wanted to build, we were never told of any major upgrades that would be forced upon us. We were not told how the **ranking system** worked, how we would **compete with other growers**, that chick quality would affect our performance, and most importantly we were never told that we would never be able to pay off our first loan before being required to do major upgrades. . . . One thing that was most noticeably left out was the fact that we would be competing against other growers that had different feed from different feed mills.

(emphasis added).

¶22. Furthermore, the record reflects that each of the broiler growers (Ballard) signed a "Broiler Production Agreement" effective January 1, 1997, when the new contracts were executed. In those agreements, the payment standards schedule contain a "Performance Adjustment Factor" provision. In that provision, it states that there will be "an adjustment to a Grower's Base Pay to reflect the Grower's performance either above or below the Weighted Average Production Cost Per Pound."

¶23. Each of the hatching egg growers (Austin) similarly signed a "Hatching Egg Production Payment Schedule" with various effective dates. Kenny Austin signed his payment schedule effective February 10, 1997; Charolett N. Hathorn signed her payment schedules effective February 10, 1997, August 11, 1998, January 1, 2000, and July 18, 2001; and Leroy Spring

signed his payment schedules effective February 1, 1997, March 25, 1999, and January 1, 2000.

¶24. The hatching eggs growers' schedule differs from the broiler's payment schedule. However, it contains provisions addressing "Hatchability Bonus and Penalty," "Feed Conversion Bonus and Penalty," and "Bonus/Penalty Calculations." The payment schedule contains a "Minimum Base Payment For Hatching Eggs and Commercial Eggs." In the "Bonus/Penalty Calculations" provision, it states "[i]t is understood and agreed that the bonus provisions of this Agreement shall be calculated from records maintained by Sanderson, such as total dozen graded hatching eggs produced and the percentage of hatchability and feed used by said chickens." This provision is contained in all versions of the hatching egg payment schedules, including the payment schedules effective in February 1997.

¶25. In SF's motion to dismiss and/or to transfer jurisdiction and/or to compel arbitration and/or for change of venue filed in the *Austin* action, SF requested the trial court to grant its motion to dismiss the Plaintiffs' claims for failure to state a claim upon which relief may be granted as they are barred by the applicable statute of limitations and/or the doctrine of laches. In SF's second supplement to its motion to dismiss, and/or to transfer jurisdiction and/or to compel arbitration and/or for change of venue, SF states:

> Plaintiffs have accepted the benefits of their respective Hatching Egg Producer's Agreements, and had done so for **five and a half years prior to filing this civil action on August 2, 2002**, as shown by the financial spreadsheet. Exhibit 28 received into evidence on the afternoon of November 18, 2003. Plaintiffs are estopped and precluded from challenging the HEP Agreements or any of the terms and provisions thereof.

(emphasis added).

¶26. SF further contends that the Plaintiffs had their opportunity to complain about a lack of meaningful choice among the many poultry producers, the costs associated with arbitration and to offer their evidence to support their position. SF argues that the Plaintiffs have waited too long to now to contest the arbitration agreement in the long term contracts they entered years ago.

¶27. The trial court in the **Ballard** action denied SF's affirmative defense of statute of limitations. Without providing any explanation, the trial court stated "[t]he Court also finds that none of [the] Plaintiffs' allegations as set forth in this action are barred by any applicable statute of limitation." In the **Austin** action, the trial court denied SF's motion to dismiss.

¶28. "This Court uses a de novo standard of review when passing on questions of law including statute of limitations issues." **ABC Mfg. Corp. v. Doyle**, 749 So.2d 43, 45 (Miss. 1999) (citing **Ellis v. Anderson Tully Co.**, 727 So.2d 716, 718 (Miss. 1998)). *See also Sarris v. Smith*, 782 So.2d 721, 723 (Miss. 2001).

¶29. "[I]n Mississippi a claim of fraud has a three-year statute of limitations in accordance with Miss. Code Ann. § 15-1-49 concerning actions without a prescribed period of limitation." **Stephens v. Equitable Life Assur. Society of U.S.**, 850 So.2d 78, 82 (Miss. 2003). Miss. Code Ann. § 15-1-49 (1) provides: "(1) All actions for which no other period of limitation is prescribed shall be commenced **within three (3) years next after the cause of such action accrued**, and not after." (emphasis added).

¶30. A fraud claim "accrues upon the completion of the sale induced by such false representation, or upon the consummation of the fraud. . . ." **Dunn v. Dent**, 169 Miss. 574, 153 So. 798 (1934).

11

¶31. The Plaintiffs claim that SF fraudulently induced them into the contract containing the arbitration agreement. Based on the record, it is clear that the Plaintiffs were aware of the matters that were allegedly misrepresented to them by SF well in excess of three years before the suits were filed. Therefore, we find that Miss. Code Ann. § 15-1-49 operates here to bar the Plaintiffs' claims. As such, there are no disputes to remand to the trial court to compel arbitration. Therefore, there is no need to address the Plaintiffs' contention that the arbitration provision is unconscionable, invalid and unenforceable.

### B. Fraudulent Concealment

¶32. As discussed above, the Plaintiffs' fraudulent inducement claims are barred by statute of limitations. In response to SF's assertion that the fraudulent inducement claims are barred by statute of limitations, the Plaintiffs intertwine fraudulent concealment into their contentions that they were fraudulently induced by SF into the contracts containing the arbitration provision. However, the Plaintiffs make no assertions as to any affirmative act by SF to conceal anything. Therefore, the Plaintiffs fail to meet the elements required to establish fraudulent concealment in order to toll the statute of limitations.

¶33. In order to establish fraudulent concealment, "there must be shown some act or conduct of an affirmative nature designed to prevent and which does prevent discovery of the claim." *Reich v. Jesco, Inc.*, 526 So.2d 550, 552 (Miss. 1988). In *Stephens*, 850 So.2d at 83-84, this Court held that in cases with a claim of fraudulent concealment there exists "a two-fold obligation to demonstrate that (1) some affirmative act or conduct was done and prevented discovery of a claim, and (2) due diligence was preformed on their part to discover it." The cause of action for fraudulent concealment accrues when the person, with reasonable diligence,

12

first knew or first should have known of the fraud. Miss. Code Ann. § 15-1-67; *Stephens*, 850 So.2d at 81. Miss. Code Ann. § 15-1-67 provides:

> If a person liable to any personal action shall fraudulently conceal the cause of action from the knowledge of the person entitled thereto, the cause of action shall be deemed to have first accrued at, and not before, the time at which such fraud shall be, or with reasonable diligence might have been, first known or discovered.

¶34. As to the first prong to establish fraudulent concealment, the Plaintiffs fail to demonstrate any affirmative act on the part of SF to conceal any information. The Plaintiffs do not provide any details of how SF concealed its alleged fraudulent actions. Merely alleging that the other side has complete control of the data simply will not suffice. *See Wingerter v. Brotherhood Prods., Inc.*, 822 So.2d 300, 303 (Miss. Ct. App. 2002) (In the context of invoking M.R.C.P. 56 (f), diligence must be shown in what steps have been taken to obtain access to the information allegedly in the exclusive possession of the other party.); *See also Marx v. Truck Renting & Leasing Ass'n, Inc.*, 520 So.2d 1333, 1344 (Miss. 1987).

¶35. The second prong to establish fraudulent concealment requires the exercise of due diligence to obtain the information. Here, the Plaintiffs do not demonstrate any action by them to obtain any of the allegedly concealed information.

## CONCLUSION

¶36. For all the reasons stated herein, we find that the statute of limitations operates here to bar the Plaintiffs' claims and is dispositive of the cases. Therefore, the trial court erred in failing to dismiss the Plaintiffs' claims and enter judgments in favor of Sanderson Farms, Inc. We reverse the judgments of the trial court, and we render judgments here in favor of

13

Sanderson Farms, Inc., finally dismissing the amended complaints and the *Ballard* and *Austin* actions with prejudice as barred by the statute of limitations.

¶37.     **REVERSED AND RENDERED.**

**SMITH, C.J., WALLER AND COBB, P.JJ., CARLSON, DICKINSON AND RANDOLPH, JJ., CONCUR. DIAZ AND GRAVES, JJ., NOT PARTICIPATING.**