# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2005-CA-00039-SCT

*STACEY CARTER, DONNELL BAYLOUS, BESSIE Y. BAYLOUS, JERRY HARMON, TINA HARMON, WALTER HENDERSON, YUMEKA HENDERSON, WANNIS D. SIDDELL AND DELORES SIDDELL*

*v.*

*CITIGROUP INC., CITIFINANCIAL MORTGAGE COMPANY, INC., ASSOCIATES FINANCIAL LIFE INSURANCE COMPANY AND AMERICAN HEALTH AND LIFE INSURANCE COMPANY*

| | |
|---|---|
| DATE OF JUDGMENT: | 12/20/2004 |
| TRIAL JUDGE: | HON. BOBBY BURT DELAUGHTER |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANTS: | J. BRAD PIGOTT |
| | J. DOUGLAS MINOR |
| ATTORNEYS FOR APPELLEES: | RICHARD CARLTON KELLER |
| | KERMIT LAGUIN KENDRICK |
| NATURE OF THE CASE: | CIVIL - OTHER |
| DISPOSITION: | AFFIRMED - 07/20/2006 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE COBB, P.J., EASLEY AND DICKINSON, JJ.**

**EASLEY, JUSTICE, FOR THE COURT:**

### STATEMENT OF THE CASE

¶1.     This case involves the sale of credit life insurance with mortgage loans.   The Plaintiffs in this action all obtained mortgage loans from Southern Mortgage Company (Southern Mortgage).   The Plaintiffs alleged that Southern Mortgage breached its fiduciary duties by

inducing them to buy overpriced credit life insurance with their loans. Southern Mortgage is not a party in this action. However, the Plaintiffs claimed that the Defendants induced Southern Mortgage to breach its fiduciary duties to the Plaintiffs.

¶2. Fifteen plaintiffs filed suit against nine defendants in the Circuit Court of the Second Judicial District of Hinds County, Mississippi, on August 7, 2002. In the course of the litigation, the claims of seven plaintiffs were dismissed because these plaintiffs previously agreed to arbitration against the defendants. The eight plaintiffs that remained were Donnell Baylous, Bessie Y. Baylous, Jerry Harmon, Tina Harmon, Walter Henderson, Yumeka Henderson, Wannis D. Siddell, and Delores Siddell (collectively known as the "Plaintiffs").

¶3. These eight Plaintiffs later voluntarily dismissed all their claims against four of the original nine Defendants. The remaining five defendants were CitiFinancial Mortgage Company, Inc. (CitiFinancial Mortgage); Associates Financial Life Insurance Company (Associates Life); American Health and Life Insurance Company (American Health and Life) (collectively known as the Defendants)[1]. Artie Armstrong and Douglas Carson were defendants employed by Southern Mortgage d/b/a/ Heritage Mortgage Company.

¶4. In their First Amended Complaint, the Plaintiffs alleged conspiracy to breach the broker's fiduciary duty; conspiracy to violate agent commission statutes; conspiracy to violate agent licensing statutes; negligent misrepresentation; breach of contractual duties of good faith

---

[1]The Defendants' brief indicates that CitiFinancial Mortgage; Associates Life; and American Health and Life are represented on appeal.

and fair dealing; and negligent supervision. The Plaintiffs later voluntarily dismissed their claim for breach of contractual duties of good faith and fair dealing.

¶5. Once discovery was complete, the Defendants filed a motion for summary judgment against the Plaintiffs. On December 16, 2004, the trial court heard oral arguments on the motion and ruled in the Defendants' favor. The trial court held:

> [T]he Court finds that there has been a failure on behalf of the plaintiff to bring forth sufficient evidence that the relationship was anything other than that of an arm's length transaction between mortgager and mortgagee. Therefore, the applicable statute of limitations bars all claims.

The trial court granted summary judgment and dismissed all of the Plaintiffs' claims against the Defendants. On January 6, 2005, the circuit court signed a Rule 54(b) Certificate of Final Judgment M.R.C.P. 54(b). The final judgment found that the motion of Defendants Citigroup; CitiFinancial Credit; CitiFinancial Mortgage; Associates First Capital Corporation; Associates Corporation of North America; Associates Life; and American Health and Life, for summary judgment was well taken and granted. The final judgment also ordered that based upon the grant of summary judgment the Plaintiffs' claims against Armstrong and Carson were also dismissed. Following this ruling, the Plaintiffs filed an appeal to this Court.

¶6. Finding that the claims are barred by the applicable three-year statute of limitations found in Miss. Code Ann. § 15-1-49 (Rev. 2003), we affirm the trial court's grant of summary judgment.

**FACTS**

¶7.    The Plaintiffs claimed that the Defendants conspired to induce Southern Mortgage to breach its fiduciary duties to them.    Southern Mortgage ran a commercial stating that "we're on your side."    Part of the agreement between Southern Mortgage and Associate Life stated that "Agent will be an independent contractor, and this Agreement will not be construed to create the relationship of employer and employee between Company and Agent."    Each of the loan transactions were independent of one another and occurred between 1997 and 1998. The facts concerning the separate transactions and individuals involved are as follows:

*1.    The Harmons*

¶8.    Jerry and Tina Harmon obtained a mortgage loan from Southern Mortgage.    They closed on a mortgage loan on October 8, 1998, in Tupelo, Mississippi.    The Harmons filed suit on August 7, 2002, almost four years after receiving their mortgage loan.

¶9.    Jerry stated that in regard to obtaining a loan he was not going in to get financial or business advice.    Nevertheless, "[w]ith Southern Mortgage or a mortgage company, you got to have some advice" about rates and whether bills should be consolidated.    Jerry did not know the best way to get the loan money, but he stated that he relied on the Southern Mortgage employee "to tell you what's the best.    I didn't know."    Jerry thought that the mortgage company would know whether he needed to consolidate all his bills.    Jerry heard about Southern Mortgage through a television commercial.    The commercial advertised about consolidating loans, getting a cheaper interest rate, getting lower payments, and having extra money.

4

¶10.    The loan document that Jerry signed stated that he was purchasing credit insurance which was not required to obtain the loan.  There was also a fifteen-day cancellation clause for the credit insurance.  The loan document contained a "Credit Insurance Authorization" section which stated:

> I understand that credit insurance is not required to obtain this loan.  Insurance provided by Lender may be from an affiliated company which expects to profit from the insurance.
>
> ***
>
> CANCELLATION OPTION: If I desire to do so I may, without penalty or obligation, within 15 days from the Date shown above, cancel all, but not part of, the optional credit insurance coverages by returning all credit insurance certificates received in connection with this loan to the Lender at the address set forth above.  Upon cancellation, the unearned credit insurance premium will be credited to my account. Even though a credit is made to my account because the credit insurance is cancelled, I will still be obligated to continue making payments on my loan as scheduled.

Jerry signed this document on October 8, 1998.

¶11.    Jerry received a GED and attended community college for a few years.  According to his testimony, Jerry can read, write, and handle his own business affairs.  He owns his own construction business.  In the course of his business, he dealt with contracts.  Jerry admitted that when a contract is signed one should be bound by the terms of the contact.

¶12.    He saw a Southern Mortgage television commercial about obtaining a loan.  Jerry went to Southern Mortgage to obtain a loan.  He did not compare the rates of other mortgage companies or lenders.  Jerry did not seek alternate financing or "shop around" between the time of his meeting at Southern Mortgage and the loan closing date.  He understood what credit life insurance is and does.  While he could not remember the name of the Southern Mortgage

5

employee, Jerry admitted that the employee explained the cost of the credit life insurance. The man that Jerry spoke to never stated that he worked for Associates or Citifinancial.

¶13.    At the closing, Jerry signed numerous documents at a lawyer's office with no Southern Mortgage employees present. Jerry did not read the closing documents. However, Jerry admitted that he was not prevented from reading the documents at the closing. When he returned home, Jerry did not read the documents either. Jerry admitted that he signed the "Credit Insurance Authorization" form which stated on its face that the premium was $3,441.99, that this insurance was not required to obtain a loan, that the insurance may be from an affiliated lender which expects to profit from the insurance, and had a fifteen-day cancellation provision. Jerry also signed a "Truth in Lending Disclosure Statement" that stated on its face that the interest rate was 13.639% and the 179 payments were in the amount of $541.26.

¶14.    Tina Harmon never spoke with anyone from Southern Mortgage. She attended the loan closing with her husband Jerry. Tina did not disagree with any of the statements made by her husband, Jerry. Tina's main concern was that a large commission was charged to them. She was not aware of any lies by the companies. Tina is a high school graduate and capable of handling her own financial affairs. She can read and write. Tina never read any of the loan documents. The credit life insurance was taken out on Jerry only. Tina did not have any credit life insurance in her name. Tina agreed that the credit life insurance was beneficial in the event her husband died because the loan would be paid. After the closing, Tina did not read the loan

documents. Tina admitted that she and her husband are bound by the terms contained in the documents that they signed.

### 2.    *The Baylouses*

¶15.    Donnell and Bessie Baylous obtained a mortgage loan from Heritage Mortgage d/b/a Southern Mortgage. They closed on a mortgage loan on July 29, 1998, in Jackson, Mississippi. A disclosure statement signed by Donnell and Bessie stated "Credit Life Insurance and Credit Disability Insurance are not required to obtain credit, and will not be provided unless you sign and agree to pay the additional cost." The Baylouses filed suit on August 7, 2002, more than four years after receiving their mortgage loan.

¶16.    In an interrogatory answer, the Baylouses stated that they met with Carson. They relied on a commercial in which Carson and Armstrong, as Heritage Mortgage, stated in effect that they "served as experts in debt consolidation and lowering monthly bills, and would provide expertise and advise to their clients, and be on the side of their clients, in entering such mortgage arrangements." At his deposition, when Donnell was asked if he was paying the representative, he stated "[w]hat I'm saying is, he's a broker, right? Doug - - I'm sure he got paid for doing this." Also, Bessie stated that Carson told them that he had reviewed the loan documents, but he did not read through the documents with them. She also stated, "[t]hat's why he got so much out of that. When we made the loan, he got so much money out of it to read them himself. That's what he said."

¶17.    Donnell received a GED. He can read and write. He saw a television commercial for Southern Mortgage. Donnell stated that he did not know that he purchased credit life insurance,

but that his wife, Bessie, was aware of it. However, he agreed that credit life insurance is not a bad idea.

¶18.    No one forced Donnell to stay at the closing or take out a loan. Donnell admitted that he and his wife did not read all of the loan closing documents. However, they were not prevented from reading the documents. They were given a copy of the documents. The documents disclosed the interest rate, finance charge, amount of money financed and the total payments due, $745.51 per month. The documents also stated the purchase price for the credit life insurance which was initialed by Donnell. Donnell agreed that had he read the documents he would have seen the amount financed, the finance charge, the total payments, and that the credit life insurance was not required. The loan documents also had a notice of a right to cancel. Another loan document also stated that credit life insurance was not required to obtain a loan. The document stated in part, "I understand that credit life insurance is not required."

¶19.    Donnell stated that he never had any conversations with CitiFinancial Credit Company and did not know how CitifFinancial Mortgage, Associates First Capital Corporation, Associates Corporation of North America, Associates Financial Life Insurance Company had harmed him.

¶20.    Bessie has a ninth grade education. She stated that she had no testimony different from her husband about how they heard about obtaining a loan. She agreed with her husband's deposition about all of the loan closing information, except that there were three people present at the closing, not four as Donnell claimed. Bessie admitted that she did not read the documents. However, she did sign documents that stated that they had three days to cancel the

loan and that they wanted credit life insurance. She agreed that she was not forced to sign the documents.

### 3.    *The Hendersons*

¶21.    Walter and Yumeka Henderson obtained a mortgage loan from Heritage Mortgage d/b/a/ Southern Mortgage. They closed on a mortgage loan on July 28, 1998, in Jackson, Mississippi. A disclosure statement signed by Yumeka and Walter stated "Credit Life Insurance and Credit Disability Insurance are not required to obtain credit, and will not be provided unless you sign and agree to pay the additional cost." The Hendersons filed suit on August 7, 2002, more than four years after receiving their mortgage loan.

¶22.    Yumeka graduated from high school. She was enrolled in college at the time of the deposition. She can read and write. Yumeka saw a commercial on television for a loan and spoke to a friend that also received a loan. In an interrogatory response which Yumeka signed, she stated the "mortgage broker representative" that she dealt with "represented that they were professional experts in looking out for my interests in such mortgage transactions, they would in effect be 'on my side' in getting me the best deal for my family and to improve my financial situation as much as possible."[2] Yumeka also stated in an interrogatory answer:

> At the time we dealt with Heritage Mortgage [Armstrong] was represented to be
> in the business or occupation of providing expertise and services in mortgage-
> related financial services and advice to borrowers involving how to consolidate

---

[2] The Baylouses' interrogatory answer had the same response.

and combine multiple loans, lower monthly payments, and otherwise simplify and improve the personal financial conditions of the individual customers.[3]

She also stated that she understood Armstrong and his business to "represent interests of their customers in getting the best financial arrangement possible." Had she read the documents, she would have understood the credit life insurance and known the purchase cost. Yumeka thought credit life insurance was a good idea and provided "security."

¶23.   Yumeka admitted that she and her husband, Walter, did not read the loan documents. Yumeka and her husband purchased insurance with the loan. The language of the contract stated that the lender can transfer the note. The documents also disclosed the interest rate and contained a notice of right to cancel within three days of obtaining the loan. The documents also disclosed that the credit life insurance was not required. Yumeka admitted that had she read the document, which she signed, she would have understood it. Yumeka signed these documents.

¶24.   Walter has an eleventh grade education. He can read and write. He learned about the loan from a television commercial. On his second visit to the loan company, they discussed credit life insurance. Walter stated that his wife, Yumeka, makes all their business decisions. He agreed with everything that Yumeka stated in regard to Exhibit 1. He signed the truth in lending disclosure statement. Walter also agreed that he was not forced to sign any documents and was not prevented from reading the documents.

### 4.   *The Siddells*

---

[3] The Baylouses' interrogatory answer had the same response.

¶25. Wannis and Delores Siddell obtained a mortgage loan from Southern Mortgage. Wannis felt mistreated and felt like Southern Mortgage did not do what it promised him. When questioned about whether he read the loan closing documents before signing them, Wannis stated that he did not read them. He stated that the lady involved with the closing told him "sign here." Wannis did not ask any questions about the documents because "she was talking so fast until I just thought she was straight." The loan closing representative did not slow down when Wannis requested her to do so. Instead, the lady said "[e]verything was going to be all right." According to Wannis, the lady "was a fast talker." In regard to the purchase of the credit life insurance, Wannis stated at one point that the insurance "sounded pretty good." Later, Wannis stated that he did not want to purchase credit life insurance. However, the representative told him that she thought the insurance would be "best." Wannis also stated that the representative told him that the insurance would be "good." However, he stated that "she didn't tell me what it was going to cost me until after everything was signed."

¶26. They closed on a mortgage loan on October 27, 1997, in Tupelo, Mississippi. A disclosure statement signed by Wannis and Delores stated "Credit Life Insurance and Credit Disability Insurance are not required to obtain credit, and will not be provided unless you sign and agree to pay the additional cost." CitiFinancial and Associates Life never made promises to Wannis. Delores never spoke to CitiFinancial, Associates Life, or American Health and Life. The Siddells filed suit on August 7, 2002, almost five years after receiving their mortgage loan.

¶27. Wannis has a GED. He can read and write and is capable of handling his own affairs. Wannis stated that it is a good idea to read documents before you sign them in order to

11

understand what you are signing. At the closing, the Southern Mortgage employee told Wannis that the credit life insurance would cost about $8,000.00. Wannis understood credit life insurance and thought it was a good idea to have it. The insurance sounded pretty good because it would cover the house if anything happened to him.

¶28. Wannis admitted that he was not forced to sign any documents, nor was he prevented him from reading the loan documents. He was also given a copy of the loan documents. The credit life insurance provision stated that the insurance was not required. The loan documents also had a three-day cancellation provision. The loan documents stated that the loan interest rate was over 13%, the payment was $682.03, and the credit life insurance was $8,340.00. Wannis and Delores initialed and signed these documents.

¶29. Wannis was unsure who he was suing. He stated that he borrowed money from Southern Mortgage and not the Defendants. Wannis realized that Southern Mortgage did not do what they had promised to do in 1997.

¶30. Delores Siddell has an eleventh grade education. She can read and write and is capable of handling her own affairs. Delores understood the concept of credit life insurance and thought that it is a good idea. She also thought that it is a good idea to read documents before you sign them.

¶31. Delores admitted that she was not forced to go to Southern Mortgage for a loan, to close, or to sign any documents. She knew in 1997 that credit life insurance was purchased with the loan. The credit life insurance provision stated that the insurance was not required. The loan documents also had a three-day cancellation provision. The loan documents also stated that the

interest rate, finance charges, and the payment amount. Wannis and Delores initialed and signed these documents. The loan documents stated that the loan may be sold without prior notice to the borrower.

¶32. At the closing Delores asked no questions but she was not prevented from asking any questions either. She stated that she never had any conversations with CitifFinancial Mortgage, Associates First Capital Corporation, Associates Corporation of North America, Associates Financial Life Insurance Company, and American Health & Life Insurance Company. None of these Defendants made any promises to pay off her bills, only Southern Mortgage made that promise. She realized that Southern Mortgage did not do what it had promised to do in 1997.

## ANALYSIS

¶33. The Plaintiffs raise four issues on appeal concerning whether the trial court erred in granting summary judgment. The Plaintiffs assert that they established a genuine issue of material fact (1) as to their claim that Southern Mortgage owed a fiduciary duty; (2) in support of the Plaintiffs' fiduciary-related claims; (3) in support of the Plaintiffs' claim that the Defendants conspired for Southern Mortgage to breach fiduciary duties owed to the Plaintiffs by failing to disclose material facts; and (4) that these material non-disclosures tolled the statute of limitations.

¶34. The Plaintiffs argue that the Defendants had a fiduciary relationship with them. This relationship allegedly stemmed from CitiFinancial Mortgage and American Health and Life's payment of commissions to Southern Mortgage, as the alleged "mortgage brokers," for the sale of its credit life insurance. The Plaintiffs argue that Southern Mortgage held itself and its

13

representative out as agents and fiduciaries by its slogan "we're on your side." The Plaintiffs stated in their depositions and answers to interrogatories that they relied upon Southern Mortgage as their alleged "brokers" to look out for their best interest or, in the very least, as representatives looking out for their best interests. In addition, the Plaintiffs argue that prior to 2002, no one at Southern Mortgage disclosed the payment of alleged illegally high commission proceeds, or that in order to receive the commissions, Southern Mortgage allegedly had to choose a lender with higher interest rates and could not find alternate credit life insurance from another company.

¶35. The trial court found that the Plaintiffs failed to demonstrate sufficient evidence that the relationship was anything other than that of an arm's length transaction between mortgager and mortgagee. The trial court then barred all claims pursuant to the applicable statute of limitations.

¶36. "This Court uses a de novo standard of review when passing on questions of law including statute of limitations issues." ***Stephens v. Equitable Life Assurance Society***, 850 So. 2d 78, 82 (Miss. 2003). In ***Andrus v. Ellis***, 887 So. 2d 175, 179 (Miss. 2004), this Court held:

> It is undisputed that the three-year statute of limitations set forth in Miss. Code Ann. § 15-1-49 (Rev. 2003) is controlling in the instant case. *See* ***Stephens v. Equitable Life Assurance Soc'y of the United States***, 850 So. 2d 78 (Miss. 2003); ***Am. Bankers Ins. Co. of Florida v. Wells***, 819 So. 2d 1196 (Miss. 2001). Section 15-1-49 provides in part:
>
>> (1) All actions for which no other period of limitation is prescribed shall be commenced within three (3) years next after the cause of such action accrued, and not after.

> This Court employs de novo review when considering issues of law such as statutes of limitations. **Stephens,** 850 So. 2d at 82.

¶37. Here, the Plaintiffs alleged breach of fiduciary duty, conspiracy, negligent misrepresentation, and negligent supervision. Much of the Plaintiffs' allegations rely upon their dealings with Southern Mortgage, who is not a party to the law suit or this appeal. The parties argued all these issues at the summary judgment hearing before the trial court.

¶38. After listening to all the Plaintiffs' arguments, the trial court ruled that the Plaintiffs' relationship was no more than an arm's length transaction between mortgagor and mortgagee. The trial court also ruled that the claims were barred by the applicable statute of limitations. An analysis based upon the statute of limitations must be addressed prior to any examination of the Plaintiffs' issues.

¶39. This Court has held that there is a three-year statute of limitations for claims of breach of a fiduciary duty, misrepresentation, and conspiracy. *See* **Am. Bankers Ins. Co. v. Wells**, 819 So. 2d 1196, 1200 (Miss. 2001). This Court has also applied a three-year statute of limitations for fraudulent concealment, negligent hiring, and concealment. **Stephens**, 850 So. 2d at 82. *See also* Miss. Code Ann. § 15-1-49; **Sanderson Farms Inc. v. Ballard**, 917 So. 2d 783, 789 (Miss. 2005) (fraudulent inducement and fraudulent concealment claims have a three-year statute of limitations and fraud claims accrue at the time of the completion of a sale induced by false representations or consummation of the alleged fraud);

¶40. In **Andrus**, this Court addressed a claim against a lender for fraudulent and negligent misrepresentation and fraudulent inducement in the purchase of credit life, disability, and

property insurance. *Andrus*, 887 So. 2d at 179. The Plaintiffs in *Andrus* alleged that they were either unaware that they purchased insurance, unaware that the insurance was not necessary, and the lender did not disclose the commission earned. *Id*. This Court found that the plaintiffs in *Andrus* were on notice of the terms of the contract and the credit insurance and all claims accrued at the time the loan agreements were executed. *Id*. at 180. In so far as the fraudulent concealment claim, the Court held that the *Andrus* plaintiffs had the documents in their possession and no one questioned any discrepancy between the document and their understanding of the document terms until filing suit. *Id*. at 181. As to the commission, this Court in *Andrus* held:

> As to the alleged failure to disclose commissions, the Court finds this argument without merit. **In the course of a private transaction where the seller encourages a buyer to purchase additional products, one would assume that the seller is motivated by some sort of incentive such as, in this instance, a commission.** There is no testimony that the Defendants concealed or denied that they were receiving commissions nor is there any testimony regarding whether the Plaintiffs specifically inquired as to such. Likewise, there is no allegation in fact or duty under law to support the argument that the Defendants were obligated to do so. We presume that parties enter into private transactions for their own personal benefit.

*Andrus*, 887 So. 2d at 181-82 (emphasis added).

¶41. All of the Plaintiffs obtained copies of their loan documents. The insurance disclosure form stated that the credit life insurance was not required to obtain the loan. Further, the disclosure form stated the purchase price of the credit life insurance. This Court has held that "whether an insured reads the entire insurance policy, the 'knowledge of its contents would be imputed to them as a matter of law.'" *Stephens*, 850 So. 2d at 82 (quoting *Cherry v. Anthony*,

16

501 So. 2d 416, 419 (Miss. 1987)). "In Mississippi, a person is charged with knowing the contents of any document that he executes." ***Russell v. Performance Toyota, Inc.***, 826 So. 2d 719, 725 (Miss. 2002). In *Stephens*, this Court held:

> [A] written contract cannot be varied by prior oral agreements. Moreover, as an evidentiary matter, parol evidence to vary the terms of a written contract is inadmissible. Finally, a person is under an obligation to read a contract before signing it, and will not as a general rule be heard to complain of an oral misrepresentation the error of which would have been disclosed by reading the contract.

*Stephens*, 850 So. 2d at 83 (quoting ***Godfrey, Bassett & Kuykendall Architects, Ltd. v. Huntington Lumber & Supply Co.***, 584 So. 2d 1254, 1257 (Miss. 1991)). We find that the Plaintiffs' claims were governed by three-year statute of limitations and the claims accrued at the time the loan documents were executed. *See **Andrus***, 887 So. 2d at 180; *Stephens*, 850 So. 2d at 82. As in *Andrus* and *Stephens*, the Plaintiffs here were on notice.

¶42. All of the claims in the case today were filed almost four or more years after the loan agreements were executed. The most recent loan closing occurred on October 8, 1998, by the Baylouses. The complaint was filed on August 7, 2002, approximately three years and ten months after the closing. Any claims against the Defendants accrued at the time of the execution of the loan documents. ***Sanderson Farms***, 917 So. 2d at 789; ***Andrus***, 887 So. 2d at 180; ***Stephens***, 850 So. 2d at 82. Therefore, all suits were filed after the running of the three-year statute of limitations.

¶43. The Plaintiffs argue that the Southern Mortgage employees were their alleged "brokers" or at a minimum the employees should have been looking out for their best interest. Even

17

assuming arguendo that the Southern Mortgage employees were "brokers," the Plaintiffs filed suit more that three years from the date of closing the loans. After closing on their house loans, the Plaintiffs had no further contact with these representatives. Only one Plaintiff contacted a Defendant to inquire about his credit life insurance. Of the Plaintiffs questioned, none asked any questions about the credit life insurance and some stated that they would never ask about any commission because it was not their business. Furthermore, many Plaintiffs stated that credit life insurance was actually a good idea. The loan documents stated the purchase price of the credit life insurance, stated that the credit life insurance was not required, and had a three-day cancellation provision. None of the Plaintiffs read the loan documents.

¶44. In *Stephens*, this Court applied a two-prong test for fraudulent concealment claims. Miss. Code Ann. § 15-1-67 (Rev. 2003) states:

> If a person liable to any personal action shall fraudulently conceal the cause of action from the knowledge of the person entitled thereto, the cause of action shall be deemed to have first accrued at, and not before, the time at which such fraud shall be, or with reasonable diligence might have been, first known or discovered.

In *Robinson v. Cobb*, 763 So. 2d 883, 887 (Miss. 2000), this Court held that "[f]raudulent concealment of a cause of action tolls its statute of limitations." This Court in *Stephens* held "the plaintiffs have a two-fold obligation to demonstrate that (1) some affirmative act or conduct was done and prevented discovery of a claim, and (2) due diligence was performed on their part to discover it." *Stephens*, 850 So. 2d at 84. *See also Andrus*, 887 So. 2d at 181. In *Sanderson*, this Court held, in regard to fraudulent concealment claims, that "there must be

18

shown some act or conduct of an affirmative nature designed to prevent and which does prevent discovery of the claim." *Sanderson*, 917 So. 2d at 790 (citing *Reich v. Jesco, Inc.*, 526 So. 2d 550, 552 (Miss. 1988)); *Andrus*, 887 So. 2d at 181; *Stephens*, 850 So. 2d at 83-84. "Merely alleging that the other side has complete control of [information] simply will not suffice." *Id*.

¶45.    The Plaintiffs did not state that Southern Mortgage made misrepresentations to them after they closed their loans.  Most of the testimony indicated that none of the Plaintiffs had conversations with any of the Defendants; therefore, no misrepresentations or subsequent acts of concealment  were made by the Defendants.[4]   Also, nothing in the deposition testimony indicates that the Defendants prevented the discovery of any alleged claims.  Therefore, we find that the first prong of the two-part test set forth in *Stephens*, that being, some affirmative act or conduct was done and prevented discovery of a claim, was not met.  The Defendants did not take any subsequent affirmative actions which were designed to prevent or did prevent discovery of the claims.

¶46.    As for due diligence, the Plaintiffs stated that they were not aware of the commission rates or that the Southern Mortgage representatives had to sell the Defendants credit life insurance and could not "shop around" for lower insurance.  The Plaintiffs claim that Southern Mortgage representatives did not disclose this information to them until 2002.  None of the Plaintiffs stated that they made any inquiries about credit life insurance or paid commissions

---

[4]    At one point, Wannis had a conversation with CitiFinacial Mortgage concerning a reduction in payments and the fact that he thought his balance was too high.  However, his loan documents contained the financed amount.  He did not indicate that CitiFinancial Mortgage made a misrepresentation to him about this question.

after closing the loans. The Plaintiffs all received copies of the loan documents from Southern Mortgage. Most of the Plaintiffs stated that they did not read the loan documents. All of the Plaintiffs stated that they were not prevented from reading the loan documents. The loan documents stated the terms of the insurance. The loan documents stated that credit life insurance was not required to obtain the loan; the interest rate; a company other than the lender could be the insurer who expected to make a profit from the sale of insurance; the premium payment amount; and the total loan finance amount. None of the Plaintiffs stated that they were precluded from asking any questions. Those Plaintiffs actually questioned about inquiries concerning insurance commissions did not ask about the payment of any insurance commission. None of the Plaintiffs objected to the credit life insurance, commissions, or loan terms in general until the filing of the complaint. The record demonstrates a total lack of due diligence by the Plaintiffs. Accordingly, the issue of the statute of limitations is dispositive of the case, and this Court need not address any other issues raised by the parties.

**CONCLUSION**

¶47. We find that the dispositive issue concerns filing the actions within the statute of limitations. We find that the Plaintiffs' claims are barred pursuant to Miss. Code Ann. § 15-1-49. Since, there is no proof of fraudulent concealment, the running of the statute of limitations on their causes of action was not tolled. We find that the trial court correctly granted the summary judgment in favor of the Defendants, on the grounds that the claims were barred by the statute of limitations. Accordingly, we affirm the judgment of the Circuit Court of the Second Judicial District of Hinds County.

20

¶48.	**AFFIRMED.**

    **SMITH, C.J., WALLER AND COBB, P.JJ., CARLSON AND DICKINSON, JJ., CONCUR. GRAVES, J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION. DIAZ AND RANDOLPH, JJ., NOT PARTICIPATING.**