# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2017-CA-00670-COA

**THE COMMERCIAL BANK**                      **APPELLANT**

**v.**

**SMITH SHELLNUT WILSON LLC**                 **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 05/01/2017 |
| TRIAL JUDGE: | HON. WILLIAM E. CHAPMAN III |
| COURT FROM WHICH APPEALED: | MADISON COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | WILLIAM C. HAMMACK |
| | STEPHEN H. KUPPERMAN |
| | LAURENCE D. LESUEUR |
| | MATTHEW RICHARD WATSON |
| ATTORNEYS FOR APPELLEE: | MARK DANIEL GRIFFIN |
| | LORI H. PATTERSON |
| NATURE OF THE CASE: | CIVIL - CONTRACT |
| DISPOSITION: | AFFIRMED - 08/07/2018 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE LEE, C.J., CARLTON AND WILSON, JJ.**

**CARLTON, J., FOR THE COURT:**

¶1. This case arises from $1,850,000 of securities that the Commercial Bank of DeKalb, Mississippi (the Bank) purchased in 2005 and 2007 from third-party securities dealers. The Bank's purchases were made based on recommendations by the Bank's investment advisor, Smith Shellnut Wilson LLC (SSW). The Bank claims that SSW negligently or intentionally misrepresented or omitted material facts when SSW advised the Bank to buy the securities and, in doing so, breached its fiduciary duty to the Bank. The Bank also claims SSW violated the Mississippi Securities Act in recommending these securities to it.

¶2. The securities at issue were issued by two non-party Soloso entities, and the securities are trust-preferred collateralized debt obligations (CDOs) (collectively, the "Soloso securities"). According to the Bank, it learned that it allegedly was not qualified to purchase the Soloso securities based on a December 2014 email from SSW. However, despite the purported ineligibility, the record reflects that the Bank continues to hold the securities at issue. The Bank, nonetheless, sued SSW in March 2016 for SSW's alleged failure to disclose the purchasing-and-holding eligibility requirements for the Soloso securities when SSW advised the Bank to purchase them. The record reflects that the Bank did not include the issuer or the securities dealers in the lawsuit.

¶3. After discovery, SSW moved for summary judgment on all the Bank's claims, namely (1) negligent or intentional misrepresentation or omission of material fact; (2) breach of fiduciary duty; and (3) violation of the Mississippi Securities Act under Mississippi Code Annotated section 75-71-509(b) (Rev. 2016). The Madison County Circuit Court granted SSW's motion for summary judgment on two independent and dispositive grounds. In granting summary judgment, the circuit court first found that the Bank's claims were time-barred by applicable statutes of limitation and repose. Second, the circuit court found that summary judgment was warranted because the Bank failed to offer competent summary judgment evidence to prove one or more essential elements on each of its claims.

¶4. The Bank appealed, raising the following issues: (1) the circuit court erred by concluding that the Bank's claims were time-barred; and (2) the circuit court erred by ignoring competent summary judgment proof on each of the Bank's claims because SSW

2

recommended certain investments and later admitted that it failed to disclose to the Bank the applicable material purchasing criteria, which the Bank did not meet. Upon appellate review, we find that (1) the Bank's claims are barred by the applicable statutes of limitation or repose;[1] and (2) the Bank cannot succeed on any of its claims on the merits because it has not shown that it is unlawful for the Bank to purchase or hold the Soloso securities; nor has the Bank shown that the issuers' alleged violation of the Investment Company Act[2] impaired the value of the Soloso securities to the Bank. We therefore affirm the circuit court's decision on these grounds.

**STATEMENT OF FACTS**

¶5.     The record reflects that with respect to the status of the parties, SSW is an investment advisory firm registered with the Securities and Exchange Commission (SEC). It provides investment advisory services for a fee based on assets under management. SSW does not, and cannot, sell securities. The record also shows that the Bank is chartered under the laws of the State of Mississippi. Under federal law, as a state-chartered, nonmember bank, the Bank's primary federal regulator is the Federal Deposit Insurance Corporation (FDIC). *See* 12 U.S.C. § 1813(q)(2) (2012). We now turn to review additional relevant facts in the record as to the disputes at issue in this appeal.

¶6.     In 1999, the Bank and SSW entered into an investment-management agreement, which was later amended in 2001. The record and briefs reflect that it is undisputed that

---

[1] *See* Miss. Code Ann. § 15-1-49 (Rev. 2012); Miss. Code Ann. § 75-71-701 (Rev. 2016); *see also* Miss. Code Ann. § 75-71-509(j) (Rev. 2016).

[2] 15 U.S.C. § 80a-1 to 80a-64 (2012).

3

SSW, as a registered investment adviser, owed a fiduciary duty to the Bank.[3] We will first address the facts of the agreement between the parties and then the evidence in the record pertaining to SSW's advice and conduct related to the purchase of the securities in this case.

¶7.    The record contains the initial investment-management agreement and the 2001 amendment. Under the agreement, SSW was to provide the Bank with "investment advice and management services that SSW shall determine to be appropriate or which is reasonably requested by the [Bank]." The agreement provides that the compensation that SSW received for its services was in the form of a fee equal to 1/10 of 1% of the Bank's assets under management. SSW did not receive commissions for any services or recommendations that it provided to the Bank. The agreement also specifies that "[a]ll transactions under this agreement shall be subject to applicable laws, rules[,] and regulations of governmental authorities. . . ." The express terms under both the original agreement and the amendment limit any warranty by SSW, as follows: "[The Bank] specifically acknowledges and agrees that SSW is not warranting to [the Bank] that the information or advice given to [the Bank] is correct or accurate or that the assets managed by SSW will necessarily increase in value or retain their value."

¶8.    The record reflects that the Soloso securities at issue in this case are notes issued by third parties: Soloso CDO 2005-1 LTD and Soloso CDO 2007-1 LTD. The notes are trust-

_____

[3] *See Belmont MB Inv. Partners Inc.*, 708 F.3d 470, 501 (3d Cir. 2013) (recognizing that investment advisors registered with the SEC owe an affirmative duty of "utmost good faith, and full and fair disclosure of all material facts, as well as an affirmative obligation to avoid misleading [its] clients") (paraphrasing *SEC v. Capital Gains Research Bureau Inc.*, 375 U.S. 180, 194 (1963)).

preferred CDOs, as noted above. Specifically, in 2005 and 2007, the record shows that SSW recommended to the Bank that it purchase these securities, and, based on SSW's recommendations, the Bank purchased a total of $1,850,000 of the Soloso securities from third-party securities dealers not named in this case.

¶9. The record reflects that the parties acknowledge that Section 5 of the Securities Act requires a company to file a registration statement and prospectus with the SEC before it offers public securities for sale. *See* 15 U.S.C. §§ 77c-77h (2012). The Soloso securities in this case, however, were privately placed securities. These securities were offered under certain available exemptions from the registration requirements of the Securities Act. Additionally, the record reflects that the co-issuers of the Soloso securities were not registered under the Investment Company Act of 1940 (ICA), as codified in Title 15 of the Unites States Code in sections 80a-1 through 80a-64 (2012).

¶10. In this appeal, the Bank asserts that the Soloso securities were offered pursuant to a Rule 144A exemption under the Securities Act, and, for this reason, they could be owned only by, and sold only to, a "qualified institutional buyer" (QIB), defined by law to include a bank that invests in at least $100 million in non-affiliated securities and has an audited net worth of at least $25 million. *See* 17 C.F.R. § 230.144A(a)(1)(vi) (2005); 17 C.F.R. § 230.144A(a)(1)(vi) (2007). Additionally, the Bank asserts that the Soloso securities could only be sold to a "qualified purchaser" under the ICA, which is defined to include a bank that "in the aggregate owns and invests on a discretionary basis, not less than $25,000,000 in investments." *See* 15 U.S.C. § 80a-2(51)(A)(iv) (2012). It is undisputed that the Bank is

neither a QIB under the Securities Act, nor a qualified purchaser under the ICA. According to the Bank, because it is not a QIB or a qualified purchaser, it was ineligible to purchase and own the Soloso securities. The Bank argues that it therefore improperly purchased and now continues to hold the Soloso securities as a result of SSW's negligent failure to disclose the applicable purchaser requirements in SSW's financial advice.

¶11. The Bank further asserts that it did not discover that it was required to be a QIB or a qualified purchaser to buy the Soloso securities until late December 2014, when it received an email from SSW wherein the Bank was described as a "non-qualified purchaser" of the Soloso securities. The record shows that SSW sent this email to the Bank in 2014 upon its discovery that Wells Fargo, the trustee for the Soloso CDO 2005 notes, had declared an "event of default" under the Soloso transaction indenture based upon a default in payment of interest due to the senior noteholders on the Class A-1 notes. As reflected in the record, SSW assessed that if liquidation were ordered, there would likely be insufficient funds to pay junior noteholders like the Bank. The email from SSW provided the Bank with options furnished by legal counsel to salvage the Bank's investment in the securities. The email identified four options the Bank had, as a "non-qualified purchaser," to participate in a lawsuit with other non-senior noteholder banks. Such a lawsuit would seek to enforce a separate "event of default" under the indenture due to these banks' failure to meet the Soloso securities' legal purchasing and holding requirements.

¶12. Despite forwarding the emailed advice from legal counsel to the Bank regarding the Bank's "non-qualified purchaser" status and options to salvage the Bank's investment in the

6

Soloso 2005 securities, SSW denies that the Bank was not qualified to purchase the Soloso securities in the case at bar. SSW's position is that the Bank is an "accredited investor" under the Securities Act, which includes "any national bank, or banking institution organized under the laws of any State." *See* 17 C.F.R. § 230.501(a)(1) (2005); 17 C.F.R. § 230.501(a)(1) (2007); *see also* 15 U.S.C. § 77c(a)(2) (2012). SSW argues that as an accredited investor under the Securities Act, the Bank indeed constituted an eligible purchaser of these securities.[4]

¶13. Although the Bank purchased the 2005 and 2007 Soloso securities from third-party securities dealers, for purposes of determining the timeliness of the Bank's claims, SSW established in discovery that it had furnished to the Bank courtesy copies of both the Soloso 2005 and also the Soloso 2007 offering circulars on at least six occasions, beginning in 2007.[5] The record reflects that the offering circulars contained notice of purchaser restrictions. The record is silent as to whether the issuer or the securities dealers also provided the offering circulars to the Bank in 2005 or 2007 when the purchases at issue

---

[4] As detailed below, exemptions from the registration requirements of the Securities Act, other than a Rule 144A exemption, were available. These include, for example, what is known as a section 4(1½) exemption, which permits sales to accredited investors, subject to certain conditions and limitations. *See* 17 C.F.R. § 230.506 (2005); 17 C.F.R. § 230.506 (2007); *see also* 17 C.F.R. § 230.501(e)(iv) (2005); 17 C.F.R. § 230.501(e)(iv) (2007).

[5] On July 25, 2007, SSW sent, via electronic mail, a copy of the offering circular for Soloso 2007 to the Bank's then Executive Vice President and Chief Financial Officer at his work email address. SSW also sent to the Bank, on four occasions, compact discs that included copies of the offering circulars for Soloso 2005 and Soloso 2007. These compact discs were sent to the Bank on December 14, 2007; June 30, 2008; February 9, 2009; and September 9, 2009. On January 11, 2011, SSW emailed the Bank another copy the offering circular for Soloso 2007.

occurred.

¶14.    As required by federal law, the front page of the offering circulars for Soloso 2005 and Soloso 2007 describe in bold print that resale and transfer restrictions applied in order for sales to be exempt from the registration requirements under the Securities Act.[6]  This language is repeated in numerous other places in each offering circular, including in the section entitled "NOTICES TO PURCHASERS."  As addressed in further detail below, each of the offering circulars also possessed an attached glossary, which defined "Accredited Investor," "Qualified Institutional Buyer," and "Qualified Purchaser" by reference to the publicly available federal statutory or regulatory definitions.

¶15.    Although the Bank initially alleged in its complaint that it had not received any Soloso securities offering circulars, the record reflects that it now acknowledges that it received the offering circulars from SSW in 2007 and several times subsequent to 2007.  However, the Bank argues that it received the offering circulars after SSW had recommended the Soloso securities and after the Bank had already purchased them.

¶16.    The Bank asserts that it had no reason to question its eligibility for the Soloso securities or to read the offering circulars because, not only had the investments already been made, but the Bank claims it reasonably relied on the financial advice of its financial advisor, SSW, as well as on the parties' agreement in which SSW acknowledged that any investments the Bank made upon SSW's recommendation would be subject to all applicable laws.  The record, however, shows that in their express written investment agreement the parties agreed

_____

[6] To avoid repetition, we will discuss the relevant language in detail below.

8

that SSW was not warranting that its advice was correct or accurate or that the assets managed by SSW would increase or retain their value.

¶17. Additionally, the Bank asserts that even if it had received the offering circulars before it purchased the Soloso securities and read them, the offering circulars were unclear and would not have given notice to the Bank that it was not permitted by law to purchase or own the Soloso securities. The record shows that the Bank's own investment policy required that the Bank maintain the prospectuses/offering circulars for the securities it purchased.

¶18. As the record reflects, the securities purchases in this case were not the first such purchases by the Bank. Through the affidavit of Frank Smith, a principal of SSW, and through the Bank's Investment and Asset/Liability Management Policy, SSW established that the Bank first started purchasing trust-preferred securities (like the Soloso securities) in 2003, well before the purchases at issue in this case.

¶19. Further, as of March 2005, before it completed the first of its Soloso purchases in August 2005, the record shows that the Bank had its own asset-liability management committee responsible for managing the Bank's investment portfolio and its own board of directors responsible for overseeing the Bank's investment activities. The record also shows that the Bank's investment policy at that time provided that the President and Investment Officer and the Executive Vice President were authorized by the committee to carry out the day-to-day investment functions as specified in the policy, including a provision prohibiting the Bank from granting any investment discretion to any third party and the requirement that the Bank ultimately be responsible for authorizing and approving all securities purchases.

In particular, the investment policy provides: "Outside investment advisory relationships are permitted provided the discretionary authority remains with the Bank."

¶20.    Under its investment policy the Bank was in charge of identifying, measuring, monitoring, reviewing, and controlling the risks of its investment portfolio. The risks that the Bank was responsible for managing included the legal risks of its investments, or the risks that could occur if a transaction violated laws or regulations.  In addition, the Bank's investment policy specifically provided that the Bank was eligible to purchase asset-backed securities, including pooled trust-preferred securities (like the Soloso securities), and, as stated, the Bank's policy required that, for each such purchase, the Bank was required to have and maintain a prospectus (i.e., an offering circular) for the security.

## COURSE OF PROCEEDINGS AND PROCEDURAL HISTORY

¶21.    Less than two years after the Bank alleges it discovered it was a non-qualified purchaser of the Soloso securities, the Bank sued SSW in March 2016 in Kemper County Circuit Court, alleging claims for negligent or intentional misrepresentation or omission of material fact, breach of fiduciary duty, and violation of the Mississippi Securities Act, namely Mississippi Code Annotated sections 75-71-509 and 75-71-717(a)(2) (1981).[7] In this action, the Bank sought rescission of the transactions, or, alternatively, damages for its alleged losses in these purchases in the amount of $1.85 million,[8] which was the total amount

_____

[7] On appeal, the Bank abandoned its claim under Mississippi Code Annotated section 75-71-717(a)(2), which is part of the 1981 version of the Mississippi Securities Act, and was repealed effective January 1, 2010.

[8] The Complaint mistakenly had "$1,350,000.00" in the final ad damnum clause, but there is no dispute that this figure should have been $1,850,000.00, as correctly set out in

10

it paid for the Soloso securities. In its answer, SSW denied the Bank's allegations of wrongdoing and asserted several affirmative defenses. SSW subsequently moved to transfer venue, and the Kemper County Circuit Court granted that motion, transferring the case to Madison County Circuit Court.

¶22. After the parties engaged in months of discovery, the record shows that SSW filed its motion for summary judgment on two independent, dispositive grounds. First, it asserted that the Bank's claims were time-barred under the following statutes of limitation and repose: (a) the Bank's claims for negligent or intentional misrepresentation or omission of material fact and breach of fiduciary duty (Counts I and II) were time-barred by the three-year statute of limitations under Mississippi Code Annotated section 15-1-49 (Rev. 2012); and (b) as of January 1, 2015, the five-year statute of repose under section 75-71-701 extinguished any and all rights and remedies the Bank may have had under the Mississippi Securities Act (Count III). Alternatively, SSW asserted that the Bank's claim under the Mississippi Securities Act was barred by the two-year limitations period or the five-year statute of repose under section 75-71-509(j). SSW also moved for summary judgment on the alternate ground that the Bank could not prove one or more essential elements on each of its claims because the Bank indeed was an eligible purchaser of the Soloso securities as an accredited investor.

¶23. Regarding the time-bar, the Bank argued that its breach of fiduciary duty and misrepresentation claims were timely because the discovery rule applied. The Bank claims that it did not have notice of the facts entitling it to bring an action until allegedly learning

paragraph thirty-four of the Complaint.

11

in December 2014 that it was a non-qualified buyer of the Soloso securities from the email SSW sent it about the Wells Fargo declaration of default. The Bank also asserted that its Mississippi Securities Act claim was not time-barred because it received no notice of its cause of action until December 2014 due to SSW's alleged ongoing misrepresentations and omissions. As to its claims on the merits, the Bank asserted that it had furnished competent proof to overcome summary judgment on the essential elements of each of its claims.

¶24. On April 17, 2017, the Madison County Circuit Court granted SSW's summary judgment motion in its entirety, entering its order on May 1, 2017. The Bank timely appealed, raising the following issues: (1) the circuit court erred by concluding that the Bank's claims were time-barred, even though the Bank's claims are based upon ongoing misrepresentations or omissions, and the offering circulars for the Soloso securities provided to the Bank did not "clearly contradict" SSW's continued misrepresentations and omissions so as to allow the Bank to discover or to be put on notice of its claims, as required under *Weathers v. Metropolitan Life Ins. Co.*, 14 So. 3d 688 (Miss. 2009); and (2) the circuit court erred by ignoring competent summary judgment proof on each of the Bank's claims because SSW recommended certain investments and later admitted in sworn interrogatories to show that it failed to disclose to the Bank the applicable purchasing criteria, which the Bank did not meet. We now turn to apply the controlling law to this case.

## STANDARD OF REVIEW

¶25. A de novo standard of review applies to statute of limitations issues. *Weathers*, 14 So. 3d at 691 (¶12). We likewise review the grant of a motion for summary judgment de

novo, viewing the evidence in the light most favorable to the Bank, the party opposing summary judgment. *Karpinsky v. Am. Nat'l Ins. Co.*, 109 So. 3d 84, 88 (¶9) (Miss. 2013). SSW, as the movant, "bears the burden of persuading the trial judge that . . . (1) no genuine issue of material fact exists, and (2) on the basis of the facts established, [it] is entitled to judgment as a matter of law." *Davenport v. Hertz Equip. Rental Corp.*, 187 So. 3d 194, 198 (¶10) (Miss. Ct. App. 2016) (quoting *Palmer v. Biloxi Reg'l Med. Ctr. Inc.*, 564 So. 2d 1346, 1355 (Miss. 1990)).

¶26.     Once SSW meets its burden, however, the Bank, as the non-movant, is "required to bring forward significant probative evidence demonstrating the existence of the triable issue of fact." *Banks ex rel. Banks v. Sherwin-Williams Co.*, 134 So. 3d 706, 710 (¶10) (Miss. 2014). "Summary judgment is appropriate when the non-moving party has failed to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Karpinsky*, 109 So. 3d at 89 (¶11). Additionally, as the party asserting that its case is not barred by the statute of limitations, the Bank has the burden of proving that the limitations period should be tolled. *Hall v. Dillard*, 739 So. 2d 383, 387-88 (¶19) (Miss. Ct. App. 1999) ("Where the plaintiff asserts that his case is not barred by the statute of limitations, the burden is on him to show some legal or equitable basis for avoiding such period of limitations.") (citing *Gulf Nat'l Bank v. King*, 362 So. 2d 1253, 1255 (Miss.1978)); *see also Trustmark Nat'l Bank v. Meador*, 81 So. 3d 1112, 1119 (¶17) (Miss. 2012) (providing that each element of fraudulent concealment must be proven by the party claiming that the limitations period is tolled by that doctrine).

## DISCUSSION

**I.     Time-Bar**

**A.     The Bank's Misrepresentation/Material Omission Claim and Breach of Fiduciary Duty Claim**

¶27.   Controlling law and the record reflect that it is undisputed that section 15-1-49, Mississippi's catch-all three-year statute of limitations, applies to the Bank's misrepresentation/material omission claim and breach of fiduciary duty claim. The parties, however, dispute the application of the discovery rule to the facts of this case. Under section 15-1-49(1), the limitations period begins within three years after the cause of action accrued. The statute also provides a discovery-rule exception to the three-year limitation period for certain situations. Specifically, section 15-1-49(2) provides: "In actions for which no other period of limitation is prescribed and which involve latent injury or disease, the cause of action does not accrue until the plaintiff has discovered, or by reasonable diligence should have discovered, the injury." We turn to apply the law to the facts of this case.

¶28.   In this case the Bank alleges that it purchased the Soloso securities based upon SSW's negligent recommendation when, according to the Bank, it was unqualified to purchase them. The Bank asserts that the discovery exception under section 15-1-49(2) applies to its claims because, it argues, it did not discover its injury until December 2014 when, according to the Bank, SSW provided the Bank an email which said the Bank was not a qualified buyer for the Soloso securities. As such, the Bank claims that its complaint, filed in March 2016, was timely because it was filed within three years from December 2014.

¶29.   The record reflects that the Bank received copies of the Soloso offering circulars on

at least six different occasions in 2007, 2008, 2009, and 2011. The 2005 and 2007 offering circulars contained notice of purchaser-eligibility requirements on the face of the documents, and the offering circulars defined the requirements by reference to publicly available federal law and rules.

### 1. The Discovery Rule

¶30. As addressed above, the Bank has the burden of proving whether the limitations period should be tolled. *Hall*, 739 So. 2d at 387-88 (¶19). Under section 15-1-49(2), the limitations period "commences upon discovery of an injury," *Donald v. Amoco Prod. Co.*, 735 So. 2d 161, 167 (Miss. 1999), and, thus, in the "summary judgment context . . . [we must] identify as a matter of law, the point at which [the Bank] knew or should have known or should have made an inquiry, based on the information available to [it]." *Weathers*, 14 So. 3d at 692 (¶14).

¶31. To benefit from the discovery rule, the Bank must also show that it exercised reasonable diligence in investigating its alleged injury, which in this case is the Bank's purchase of the Soloso securities based upon SSW's alleged negligent recommendations when, according to the Bank, it was unqualified to purchase them. *See, e.g.*, *Peoples Bank of Biloxi v. McAdams*, 171 So. 3d 505, 509-10 (¶¶17-22) (Miss. 2015) (holding that plaintiff failed to exercise due diligence as a matter of law and thus his negligence claim was time-barred); *Smith v. Sanders*, 485 So. 2d 1051, 1052 (Miss. 1986). "The would-be plaintiff need not have become absolutely certain that he had a cause of action; he need merely be on notice—or *should* be—that he should carefully investigate the materials that suggest that a

15

cause probably or potentially exists." *First Trust Nat'l Assoc. v. First Nat'l Bank of Commerce*, 220 F.3d 331, 336-37 (5th Cir. 2000) (citing Mississippi cases). We will address notice and the requirement of reasonable diligence in applying the discovery rule to this case.

### a. Notice

¶32. Applicable law pertaining to the discovery rule also establishes that a plaintiff "need not have actual knowledge of the facts before the duty of due diligence arises; rather, knowledge of certain facts which are 'calculated to excite inquiry' give rise to the duty to inquire. The statute of limitations begins to run once plaintiffs are on inquiry that a *potential* claim exists." *Id.* at 336 n.4.[9]

¶33. In this case, the record reflects that the offering circulars expressly set forth the federally required language regarding sale restrictions on the Soloso securities, which form the predicate for the Bank's claims against SSW. Jurisprudence reflects that the Bank was not at liberty to simply ignore this information, which was federally required to be in the offering circulars to notify purchasers of eligibility restrictions. *Kravetz v. U.S. Tr. Co.*, 941

---

[9] *See Peoples Bank of Biloxi*, 171 So. 3d at 509-10 (¶¶17-22) (finding that the Harrison County Chancery Clerk's negligence claim against a bank for paying on a forged check accrued on date when the Chancery Clerk, had he exercised reasonable diligence, could have requested missing bank statements that would have revealed the bank's negligence); *Spann v. Diaz*, 987 So. 2d 443, 449-50 (¶19) (Miss. 2008) (finding that a client's legal malpractice claim accrued on the date the court handed down its order denying, as time-barred, her lawyer's motion to add a doctor as a defendant in the medical malpractice action, where the opinion "explicitly stated that [the doctor] should have been added at the outset of the litigation," and both the opinion and order were of public record); *Russell v. Williford*, 907 So. 2d 362, 364-66 (¶¶10-17) (Miss. Ct. App. 2004) (finding that a plaintiff's medical malpractice claim was time-barred as a matter of law where post-operative abnormalities occurring decades before he filed his complaint constituted facts "calculated to excite inquiry" on the plaintiff's part, giving rise to the duty to inquire further regarding a potential claim).

F. Supp. 1295, 1308 (D. Mass. 1996). In applying the law to this case, the limitations period, therefore, began to run when the Bank received the offering circulars beginning in 2007, as the Bank does not dispute receipt of the offering circulars in 2007 and numerous times thereafter. Under Mississippi law, upon receipt of the offering circulars, the Bank knew or should have known to make an inquiry regarding purchaser restrictions and SSW's allegedly negligent recommendation to purchase the Soloso securities. *Weathers*, 14 So. 3d at 692 (¶14); *see First Trust*, 220 F.3d at 336-37; *Kravetz*, 941 F. Supp. at 1308.

¶34. In particular, the cover page of the offering circulars provides the following in all caps:

> THE NOTES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT NOR HAS EITHER OF THE CO-ISSUERS BEEN REGISTERED UNDER THE INVESTMENT COMPANY ACT. THE NOTES MAY NOT BE OFFERED OR SOLD WITHIN THE UNITED STATES OR TO U.S. PERSONS (AS DEFINED IN REGULATIONS UNDER THE SECURITIES ACT), EXCEPT TO "QUALIFIED INSTITUTIONAL BUYERS" (AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT) OR "ACCREDITED INVESTORS" (AS DEFINED IN RULE 50l(a) UNDER THE SECURITIES ACT). THE NOTES MAY NOT BE OFFERED OR SOLD WITHIN THE UNITED STATES OR TO U.S. PERSONS EXCEPT TO "QUALIFIED PURCHASERS" (WITHIN THE MEANING OF SECTION 3(c)(7) OF THE INVESTMENT COMPANY ACT) IN A TRANSACTION THAT DOES NOT CAUSE EITHER OF THE CO-ISSUERS TO BE REQUIRED TO REGISTER UNDER THE INVESTMENT COMPANY ACT. FOR CERTAIN RESTRICTIONS ON RESALE SEE "DELIVERY OF THE NOTES; TRANSFER RESTRICTIONS; SETTLEMENT."

This language is repeated in numerous other places in each offering circular, including in the section entitled "NOTICES TO PURCHASERS," where this information again appears in all capital letters. Further, each offering circular possessed a glossary which defined the

17

terms "Accredited Investor" (citing Rule 501(a) promulgated under the Securities Act),[10] "Qualified Institutional Buyer" (citing Rule 144A(a)(1) promulgated under the Securities Act),[11] and "Qualified Purchaser" (citing Section 3(c)(7) of the Investment Company Act),[12] by reference to the publically available federal laws and rules. The record reflects that it is undisputed that the Bank is neither a QIB under the Securities Act, nor a qualified purchaser under the Investment Company Act.

¶35. The Bank asserts that it could not have been put on notice of the eligibility requirements by reference to the offering circulars alone. The law reflects, however, that the existence of a fiduciary relationship does not permit "the principal of a fiduciary [to] . . . permanently and willfully . . . ignore patent evidence of the fiduciary's breach so as to delay indefinitely the accrual of an action against the fiduciary. Statutes of limitations exist to protect the courts from indolent claimants as well as defendants from stale claims." *First*

---

[10] Under Rule 501(a), an "accredited investor" includes "[a]ny bank as defined in section 3(a)(2) of the Act," which includes the Bank. *See* 17 C.F.R. § 230.501(a)(1)); *see also* 15 U.S.C. § 77c(a)(2) (section 3(a)(2) of the Act) (stating "the term 'bank' means any national bank, or banking institution organized under the laws of any State, . . . the business of which is substantially confined to banking and is supervised by the State or territorial banking commission or similar official"). SSW maintains that because the Bank is an "accredited investor," it was eligible to purchase the Soloso securities.

[11] In relevant part, Rule 144A(a)(1) provides that a QIB is any bank "that in the aggregate owns and invests on a discretionary basis at least $100 million in securities of issuers that are not affiliated with it and that has an audited net worth of at least $25 million. . . ." *See* 17 C.F.R. § 230.144A(a)(1)(vi) (2005).

[12] A qualified purchaser under the Investment Company Act includes "any person, acting for its own account or the accounts of other qualified purchasers, who in the aggregate owns and invests on a discretionary basis, not less than $25,000,000 in investments." *See* 15 U.S.C. § 80a-2(51)(A)(iv).

18

*Trust*, 220 F.3d at 337-38. Additionally, the investment-management agreement between the parties did not relieve the Bank of the obligation to familiarize itself with the investment materials that were sent to it and were created pursuant to federal law. *See Kravetz*, 941 F. Supp. at 1308.

¶36. An application of the law to this case reflects that the language of the offering circulars, containing the federally required notice of purchaser restrictions with reference to publicly available federal law, was sufficient to put the Bank on inquiry notice that "[it] should carefully investigate the materials that suggest that a cause probably or potentially exists." *See First Trust*, 220 F.3d at 336-37; *Kravetz*, 941 F. Supp. at 1308 (determining that even where a fiduciary relationship was alleged, investors were imputed with knowledge of investment materials for purposes of determining when they should have been on inquiry notice); *see also Weathers*, 14 So. 3d at 692 (¶14) (The limitations period begins when the plaintiff "knew or should have known *or should have made an inquiry*, based on the information available to [it]." (emphasis added)).

¶37. Relying primarily on *Weathers*, the Bank also asserts that the offering circulars were insufficient to put it on notice of any claim against SSW because the information that the offering circulars provided did not "clearly contradict" SSW's recommendations. We find that the Bank's argument on this issue is misplaced because it applies the wrong standard. Jurisprudence reflects that the applicable standard is whether the language was sufficient to put the Bank on notice to inquire about the purchaser-eligibility requirements. *Weathers*, 14 So. 3d at 692 (¶14); *see Spann*, 987 So. 2d at 449-50 (¶19); *see also First Trust*, 220 F.3d at

336 n.4.

¶38.   In *Weathers*, 14 So. 3d at 689 (¶2), the insured (Weathers) sued MetLife for fraud and other causes of action based on representations made by his agent that his premium obligation would "vanish" after ten years because the policy would become self-sustaining through dividends after that time.  Weathers brought his lawsuit after he received notice about a class-action lawsuit against MetLife concerning the "vanishing" premium feature in his policy, arguing that his lawsuit was timely because the limitations period was tolled until he received the notice.  *Id.* at 690-91 (¶¶7-8).

¶39.   MetLife argued that Weathers's lawsuit was time-barred because he had a duty to read his insurance policy when he received it and that the dividend provisions, together with a clause that said the agent could not vary the terms of the policy, should have put Weathers on notice of the agent's misrepresentations at that time.  *Id.* at 692 (¶16).  Weathers claimed that he would not have been aware of any cause of action by reading the policy because it was consistent with the agent's representations.  *Id.* at 692, 694 (¶¶15, 20).  On these facts, the Mississippi Supreme Court reversed summary judgment in MetLife's favor, finding that "a genuine issue of material fact exists as to whether [the agent's] representations conflicted with the plain language of the policy, so as to place Weathers on notice of any alleged misrepresentation or fraud at the time the policy was issued." *Id.* at 694 (¶21).

¶40.   *Weathers* is distinguishable on its facts from the present case.  In *Weathers*, the insurer drafted and issued the policy; in this case SSW did not draft the offering circulars, and SSW was not the dealer or issuer of the securities.  Moreover, the offering circulars in this case

20

contained the federally required notice that purchaser restrictions existed. Jurisprudence acknowledges that the very purpose of this federally required language was to put prospective purchasers on notice of purchaser restrictions. *See Kravetz*, 941 F. Supp. at 1308. Further, in *Weathers*, there was no contradiction between the agent's advice and the policy language to put Weathers on notice. In this case, the premise of the Bank's lawsuit is that it was not a QIB or a qualified purchaser, which is in direct contrast to the sales restrictions in the federally required notice in the offering circulars as to entities that were not QIBs or qualified purchasers. Also, unlike Mr. Weathers, with respect to the Bank's ability to assess the need to investigate the notice in the offering circulars, the record shows no evidence that would entitle the Bank to "lay" status. *See First Trust*, 220 F.3d at 336-38 (finding that the terms of a disbursement agreement between First Trust and a fiduciary bank did not allow First Trust to claim "lay" status as to whether First Trust was entitled to rely on the fiduciary Bank's representation as to whether proof of default had occurred since First Trust, as a trust company, was charged with reading a trust indenture and being aware of the rights and duties therein). An application of the controlling law to the facts of this case reflects that in 2007, and numerous times thereafter, the Soloso offering circulars were sufficient to place the Bank on notice to inquire as to any potential "negligent recommendation" claims against SSW. In addition to notice, the discovery rule also requires reasonable diligence, as addressed in the next section.

### b.  *Reasonable Diligence*

¶41.  Consistent with the discovery rule and inquiry-notice principles discussed above,

jurisprudence also reflects that the principal of a fiduciary is not permitted to "permanently and willfully . . . ignore patent evidence of the fiduciary's breach . . . ." *First Trust*, 220 F.3d at 3378. Once placed on notice by the offering circulars, the Bank must exercise reasonable diligence in investigating its alleged injury so as to toll the limitations period. *See, e.g.*, *First Trust*, 220 F.3d at 336-37*; Peoples Bank of Biloxi*, 171 So. 3d at 509-10 (¶¶17-22); *Smith*, 485 So. 2d at 1052. The record reflects that the Bank had previously purchased trust-preferred securities (like the Soloso securities) beginning in 2003, prior to SSW's advice regarding the 2005 and 2007 Soloso securities purchases; and the Bank had its own internal asset liability management committee and investment policy. The record further reflects that the Bank was an "accredited investor" under federal securities law and that the Bank should not be treated as a lay person for latent-injury determination.[13]

¶42.    The existence of a fiduciary relationship between the Bank and SSW does not excuse the Bank from reading the offering circulars containing the federally required disclosures. As one court has explained: Even where a fiduciary relationship exists, "[a]n investor's . . . blind reliance upon an investment advisor's advice[] should not relieve the investor of his common sense obligation to review investment materials which are created pursuant to federal mandate and which are provided to him." *Kravetz*, 941 F. Supp. at 1308; *see also, e.g.*, *J. Geils Band Emp. Ben. Plan v. Smith Barney Shearson Inc.*, 76 F.3d 1245, 1259 (1st Cir. 1996) ("Even assuming that [defendants] owed [plaintiffs] a fiduciary duty, an investor

---

[13] An "accredited investor" includes "[a]ny bank as defined in section 3(a)(2) of the Act," which includes the Bank. *See* 17 C.F.R. § 230.501(a)(1)); *see also* 15 U.S.C. 77c(a)(2).

must apply his common sense to the facts that are given to him . . . in determining whether further investigation is needed.") (internal quotation marks omitted); *DeBruyne v. Equitable Life Assurance Soc'y of the U.S.*, 920 F.2d 457, 466 n.18 (7th Cir. 1990) (Where plaintiffs alleged misrepresentation claims against ERISA fiduciary, the court held that they "cannot avoid the statute of limitations by possessing, but failing to read, the documents that would put them on inquiry notice.").

¶43. The Mississippi Supreme Court recognizes this concept in a broader context by consistently holding that a contracting party is obligated to read a document he has signed or be imputed with knowledge of its contents, including in the situation where a fiduciary relationship is alleged. *See Grand Legacy LLP v. Gant*, 66 So. 3d 137, 144-45 (¶¶22-26) (Miss. 2011) (explaining that a fiduciary relationship does not vitiate a contracting party's duty to read the contract and that the party will be imputed with the knowledge of its provisions); *see Mladineo v. Schmidt*, 52 So. 3d 1154, 1162 (¶26) (Miss. 2010) (discussing cases and recognizing that "the 'duty-to-read' and 'imputed-knowledge' doctrines are firmly rooted in Mississippi precedent").

¶44. The Bank first purchased trust-preferred securities (like the Soloso securities) in 2003, then, after advice from SSW, the Bank purchased the 2005 and 2007 Soloso securities from third-party securities dealers. The record is silent as to whether the Bank requested or received the offering circulars for the securities before it bought them from the third-party securities dealers. We nonetheless acknowledge that the record does reflect that the Bank was required to have and maintain a prospectus (offering circular) for purchased securities

23

in accordance with its own investment policy, and the non-party sellers (the third-party securities dealers) were obligated to furnish copies of the offering circulars prior to their sale.[14] Regardless of the disclosures among the Bank and the third-party issuer and securities dealers, jurisprudence and FDIC supervisory policy[15] place a duty on the Bank to read the federally required language in the offering circulars when the Bank received them. Further, though we do not opine on the validity of such a provision, nor has either party raised this issue, we find it relevant that the investment-management agreement between the parties expressly showed that SSW provided no warranty that its advice was correct or accurate. Having agreed to this warranty-disclaimer provision in both the original agreement and the 2001 amendment, the Bank, at the very least, was certainly obligated to read the offering circulars and understand the transactions it undertook.

### i.    *FDIC Policy and the Bank's Investment Policy*

¶45.    The Bank's obligations under FDIC regulatory policy and its own investment policy require that the Bank know and understand the Soloso securities and the Bank's suitability as a purchaser. Also, FDIC regulatory policy and the Bank's own investment policy specify

---

[14] The 2007 offering circular, for example, provided the purchaser restriction that "[n]o purchase of these securities may be made except pursuant to this Offering Circular. This Offering Circular may be transmitted electronically, but each investor in the securities should receive a printed version thereof prior to purchase. If you do not receive a printed version of this Offering Circular, please contact your Initial Purchaser representative at the address provided herein." In this case, the "Initial Purchasers" were the third-party securities dealers, Bear, Stearns & Co. Inc. and SunTrust Robinson Humphrey, which were identified on the cover page of the offering circular.

[15] *See* FDIC Supervisory Policy Statement on Investment Securities, 63 Fed. Reg. 20191 (Apr. 23, 1998).

that the Bank retain the ultimate discretionary authority in deciding what securities are purchased. As such, these policies are relevant in assessing the Bank's due diligence obligations, and further show that it is not relieved from reading the Soloso offering circulars. For example, in *Martinez Tapia v. Chase Manhattan Bank, N.A.*, 149 F.3d 404 (5th Cir. 1998), the court held that where the investor, Martinez Tapia, retained final say on all investments, the existence of an alleged fiduciary relationship between the investor and fund representatives "did not serve to relieve Martinez Tapia from making a reasonably diligent effort to inform himself about his purchase, and did not toll the statute of limitations." *Id.* at 412. Also relevant is the court's observation that "[t]he evidence is undisputed that Martinez Tapia is a sophisticated and successful businessman. . . . [I]t was incumbent upon Martinez Tapia to do more than simply rely on the bald assertions and promises of [the fund representatives]. Before he invested over two and one-half million dollars, reasonable diligence required him to read the only documents that contained the details of the offer he accepted when he purchased the Fund Units [i.e., the fund offering circular]." *Id.* at 410; *see Rowten v. Wall St. Brokerage L.L.C.*, 646 F. App'x 379, 384 (5th Cir. 2016) ("[W]e conclude that a reasonable investigation required Rowten [the investor] to read the Prospectus. Had she done so, she would have learned immediately that her investment in the REIT was not guaranteed, contrary to the alleged representations from which this lawsuit arises.").

¶46. Specifically, the FDIC Supervisory Policy Statement on Investment Securities, 63 Fed. Reg. 20191, 20194 (Apr. 23, 1998), provides the following: "Irrespective of any responsibility, legal or otherwise, assumed by a dealer, counterparty, or financial advisor

25

regarding a transaction, the acquiring institution is ultimately responsible for the appropriate personnel and understanding and managing the risks of the transaction." Understanding the risks of a transaction includes understanding its legal risk, which entails assessing a counterparty's[16] authority to enter into the transaction and the transaction's legal enforceability. *Id.* at 20197. This FDIC supervisory policy statement also provides that banks must have policies specifying the required documentation, such as offering circulars, needed to undergo this analysis and understand the risks associated with a bank's investment securities. *Id.* at 20195.

¶47. The record reflects that these FDIC supervisory policies are incorporated in the Bank's own investment policy and are reflected in the investment-management agreement between the parties.[17] As detailed above, the Bank's policy includes a provision specifying that "[o]utside investment advisory relationships are permitted provided the discretionary authority remains with the Bank." Additionally, the record shows that the Bank's own policy required the Bank to have and maintain a prospectus (i.e., an offering circular) for purchased securities; and that the Bank's own policy required that the Bank be in charge of identifying, measuring, monitoring, reviewing, and controlling the risks of its investment portfolio,

---

[16] A "counterparty" is a party to a financial transaction. Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/counterparty (last visited Aug. 6, 2018).

[17] Although the Bank's internal policy does not create a "standard of conduct that establishes what the law requires of a reasonable person under the circumstances," 57A Am. Jur. 2d Negligence § 174 (2004), it may be considered as evidence of the standard of care the Bank must meet in exercising reasonable diligence in purchasing and monitoring its investments. *See Miss. Baptist Health Sys. Inc. v. Kelly*, 88 So. 3d 769, 785 (¶61) (Miss. Ct. App. 2011) (Maxwell, J., specially concurring) (citing authorities).

included the legal risks of its investments or the risks that could occur if a transaction violated the laws or regulations.[18]

### ii.    The Parties' Investment-Management Agreement

¶48.    Also relevant in assessing the Bank's due diligence obligations is the parties' investment-management agreement.  The Bank asserts that because the parties' investment-management agreement provided that "all transactions under this agreement shall be subject to applicable laws, rules and regulations of governmental authorities[,]" it had no reason to read the offering circulars when SSW sent them to the Bank.  However, a review of the record, including the express language of the agreement, and the parties' arguments, reflects nothing in the parties' investment-management agreement that relieves the Bank from reading and understanding the offering circulars and the securities it was purchasing.  Indeed, as we have noted, the agreement between the parties expressly provides that SSW was not warranting to the Bank that its advice was correct or accurate or that the assets managed by SSW would necessarily increase in value or retain their value.  Also, as acknowledged, jurisprudence establishes that a principal of a fiduciary is not permitted to "permanently and willfully . . . ignore patent evidence of the fiduciary's breach," *First Trust*, 220 F.3d at 337;

---

[18] The Bank asserts that "legal risk" does not encompass knowing whether it was eligible to purchase the securities because the term only relates to a counterparty's contractual performance.  This interpretation is too narrow.  Knowing and understanding the purchaser-eligibility requirements for the Soloso securities transactions falls within FDIC policy and the Bank's own policy, which require that the Bank understand and manage risk involving a transaction's legal enforceability.  As the Bank explained in its *own* briefing and at oral argument, a non-qualifying purchaser could trigger the issuer's registration requirements under the Investment Company Act, thus directly affecting the legal obligations between the Bank and the issuer/counterparty.

and an application of the law to this case reflects that the Bank was not relieved of its obligation to familiarize itself with the investment materials sent to the Bank that were created pursuant to federal law. *See Kravetz*, 941 F. Supp. at 1308.

¶49.    Addressing an argument similar to the one the Bank makes here, the *Kravetz* court explained:

> The [Investment Advisory] Agreements authorized the defendants to perform certain advisory services for the plaintiffs for an annual fee. None of the provisions in the Agreements either expressly or implicitly relieved the plaintiffs of their obligation to familiarize themselves with their possible investments or read investment materials which were sent to them. . . . To the extent that it is relevant to the question of whether the Kravetzes exercised "reasonable diligence," it is clear that the Kravetzes exercised no diligence at all. Therefore, the Kravetzes can derive no benefit from either the text or their subjective interpretations of the [Investment Advisory] Agreements.

*Id.* (citation omitted).

¶50.    Just like in *Kravetz*, the investment-management agreement here contains no provisions that would obviate the Bank's duties to familiarize itself with and read the investment materials and offering circulars that bore the federally required notice of purchaser restrictions. On the contrary, in the parties' original 1999 agreement, and again in the parties' 2001 amendment to that agreement, the Bank "specifically acknowledges and agrees that SSW is not warranting to [the Bank] that the information or advice given to [the Bank] is correct or accurate. . . ." This provision in the parties' agreement reflects that the Bank, in exercising its own due diligence, must review and familiarize itself with the products it purchases.[19]

_____

[19] The offering circulars also instructed the Bank to conduct further inquire specifically with respect to the legality of an investment in the securities:

¶51. Based upon the foregoing, we find no error in the circuit court's determination that the discovery rule does not toll the limitations period beyond 2007. An application of the law to the facts of this case reflects that in 2007, and numerous times thereafter, the Bank received the offering circulars that contained the notice of purchaser restrictions provided pursuant to federal law. As such, the three-year statute of limitations under section 15-1-49 applicable to the Bank's misrepresentation/material omission claim and breach of fiduciary duty claim expired in 2010. The Bank's complaint was not filed until March 2016, and we therefore affirm the circuit court's findings that these claims are time-barred.

### 2. The Fraudulent-Concealment Doctrine

¶52. We now turn to address the Bank's argument that the fraudulent-concealment doctrine applies to toll the statute of limitations. The Bank asserts that SSW owed it a fiduciary duty of full and fair disclosure, and, the Bank argues, SSW's alleged failure to disclose the eligibility requirements for the Soloso securities was an affirmative act of concealment that tolled the limitations period until 2014 when, according to the Bank, it first learned it was not a qualified purchaser.[20] However, a review of the record reflects no evidence of affirmative acts of concealment by SSW as is required by law to establish fraudulent concealment.[21]

_____

> INVESTORS WHOSE INVESTMENT AUTHORITY IS SUBJECT TO LEGAL RESTRICTIONS SHOULD CONSULT THEIR OWN LEGAL ADVISORS TO DETERMINE WHETHER AND TO WHAT EXTENT THE NOTES CONSTITUTE LEGAL INVESTMENTS FOR THEM.

[20] *See* Miss. Code Ann. § 15-1-49 (Mississippi's catch-all three-year statute of limitations applies to the Bank's misrepresentation/material omission claim and breach of fiduciary duty claim).

[21] *See Sanderson Farms Inc. v. Ballard*, 917 So. 2d 783, 790 (¶¶33-34) (Miss. 2005).

Instead, the record shows SSW provided the Bank with the offering circulars in 2007 and numerous times thereafter; and the offering circulars contained the federally required notice of purchaser restrictions. In light of the fact that the record contains no evidence of affirmative acts of concealment as such is defined by precedent; we find no error in the circuit court's determination that the Bank's claims are time-barred, as the fraudulent concealment doctrine is inapplicable to this case. *See Trustmark Nat. Bank*, 81 So. 3d at 1119 (¶17). We turn to further address the application of the fraudulent concealment doctrine to the facts of this case.

¶53. The Bank, as the party using fraudulent concealment to assert a tolling of the statute of limitations, has the burden of proving "(1) some affirmative act of conduct was done and prevented discovery of the claim; and (2) due diligence was performed on its part to discover the claim." *Id.* We acknowledge case law establishing that where a fiduciary relationship exists, as here, failure to disclose can constitute an affirmative act. *Bennett v. Hill-Boren, P.C.*, 52 So. 3d 364, 372 (¶25) (Miss. 2011). Jurisprudence reflects that the "affirmative act of concealment," however, "must be some subsequent affirmative act by the defendant which was *designed to prevent* and which did prevent discovery of the claim." *Bullard v. Guardian Life Ins. Co. of Am.*, 941 So. 2d 812, 818-19 (¶31) (Miss. 2006) (emphasis added); *see Channel v. Loyacono*, 954 So. 2d 415, 423 (¶29) (Miss. 2007) ("The affirmative act must in fact be designed to prevent the discovery of the claim."). The Bank has offered no proof of satisfying these requirements.

30

¶54. In particular, the Bank asserts that SSW's continued silence coupled with its belated furnishing of the offering circulars, and SSW's presentations about other trust-preferred securities made after SSW made the Soloso recommendations, constituted subsequent acts of concealment sufficient to toll the limitations period.[22] However, upon examination, precedent reflects that the Bank fails to show evidence in the record to satisfy the requirement of affirmative acts of conduct and the requirement of due diligence necessary to apply the fraudulent concealment doctrine.[23]

¶55. The Bank asserts that SSW should have told the Bank to read the offering circulars, and SSW's failure to do so constitutes fraudulent concealment. A review of jurisprudence reflects, however, that providing the offering circulars with the notice required by law constitutes sufficient notice and does not demonstrate concealment. *See Kravetz*, 941 F. Supp. at 1308-09. Rather than being "designed to prevent" discovery of the Bank's claims, the offering circulars disclosed the federally required notice that purchaser restrictions

---

[22] As addressed below in connection with the Bank's other fraudulent concealment arguments, SSW furnished the offering circulars which disclosed the federally required purchaser restrictions for the Soloso securities, and SSW gave no warranty as to the accuracy or correctness of its advice. Accordingly, there is also no evidence to support the Bank's argument that SSW's presentations regarding other trust-preferred securities somehow allegedly concealed the Bank's claims here which arise from its purchase of the Soloso securities in 2005 and 2007, and its alleged purchaser ineligibility. Additionally, the record contains no evidence that subsequent presentations regarding *other* trust-preferred securities constitute acts of concealment *designed to prevent discovery of the claim at issue*, as required under the applicable jurisprudence. *See Bullard*, 941 So. 2d at 818-19 (¶31); *Channel*, 954 So. 2d at 423 (¶29).

[23] *See Sanderson Farms Inc.*, 917 So. 2d at 790 (¶¶33-34).

existed.[24] Additionally, the express terms of the written agreement between the parties reflect that the parties agreed that SSW was not warranting to the Bank that the information or advice given to the Bank was accurate or correct or that the assets managed by SSW would necessarily increase in value or retain their value. Regardless of the validity of this provision, having twice agreed to this warranty-disclaimer provision, common sense dictates that the Bank's choice to ignore the offering circulars, and the purchaser restriction information they contained, does not constitute an act concealment on SSW's part.

¶56.    In *Kravetz*, *id.*, the court rejected a similar argument made by the plaintiffs there. The Kravetzes sued their investment advisors for securities fraud and claimed fraudulent concealment when faced with a limitations defense. It was undisputed that the Kravetzes' advisors gave them the offering memoranda. The Kravetzes, however, argued that due to the fiduciary relationship between them and their advisors, mere receipt of the offering memoranda did not start the limitations period running because their advisors owed them an

---

[24] Both offering circulars had a glossary attached which defined "qualified institutional buyer" and "qualified purchaser," by reference to the publicly available federal statutory or regulatory definitions. The fact that the Bank needed to determine these definitions by use of the glossary or reference to publicly available definitions does not bolster the Bank's fraudulent concealment argument because jurisprudence reflects that fraudulent concealment "cannot apply to matters of public record." *Spann*, 987 So. 2d at 450 (¶19) (no fraudulent concealment where court's opinion and judgment were of public record and provided notice to plaintiff of her potential legal malpractice claim); *O'Neal Steel Inc. v. Millette*, 797 So. 2d 869, 875 (¶23) (Miss. 2001) (plaintiff corporation was required to search land records in county where judgment debtor resided where, had it done so, it would have found the alleged fraudulent property transfer upon which its lawsuit was based); *see also Walton v. Walton*, 52 So. 3d 468, 472 (¶18) (Miss. Ct. App. 2011). Based upon a review of the applicable law and the record in this case, the record reflects no evidence of fraudulent concealment so as to toll the limitations period on these undisputed facts.

affirmative duty of disclosure that was not met simply by providing the offering documents.

*Id.* The court rejected this assertion and provided as follows:

> The undisputed facts demonstrate that the defendants fully disclosed, in writing, and often in bold print, the risk factors associated with the plaintiffs' investments. These disclosures were made in offering memoranda and other documents which were routinely sent to the Kravetzes. The fact that the Kravetzes chose not to read these documents does not constitute fraudulent concealment on the part of the defendants.

*Id.* at 1309;[25] *see Grand Legacy LLP*, 66 So. 3d at 145 (¶¶25-26) (recognizing fiduciary relationship existed among the parties, but finding no fraudulent concealment where the contract signed by plaintiff Grand-LLP "unequivocally showed" the price differential upon which plaintiffs' lawsuit was based). SSW provided the offering circulars to the Bank on at least six occasions. As set forth in *Kravetz*, the fact that the Bank chose not to read them, or investigate the notice therein, fails to constitute fraudulent concealment on SSW's part. The law requires an affirmative act of concealment, which the Bank has not shown here. *See, e.g., Trustmark Nat'l Bank*, 81 So. 3d at 1119 (¶17) (citation omitted); *Sanderson Farms Inc.*, 917 So. 2d at 790 (¶¶33-34).

¶57. Under the law applicable to this case, the second prong of the fraudulent concealment test requires that the proponent of this theory show it exercised due diligence in investigating

---

[25] We recognize that the Massachusetts Supreme Judicial Court declined to apply this analysis from *Kravetz* where unsophisticated investors were involved. *See Hays v. Ellrich*, 31 N.E.3d 1064, 1075-76 (Mass. 2015). As we address above, however, the Bank failed to show any evidence it was entitled to "lay" status. Further, the Bank had an independent obligation under FDIC regulatory policy, *see, e.g.*, FDIC Supervisory Policy Statement on Investment Securities 63 Fed. Reg. 20191 (Apr. 23, 1998), and its own investment policy to understand the Soloso securities and the eligibility requirements. As such, the analysis in *Kravetz* is wholly applicable here.

33

the information necessary to establish its claims. *Trustmark Nat. Bank*, 81 So. 3d at1119

(¶17); *Sanderson Farms Inc.*, 917 So. 2d at 790 (¶35). The record reflects that the Bank did

not demonstrate any action by it to obtain any such information. In particular, the Bank

provided no proof that, upon receipt of the offering circulars in 2007, it exercised due

diligence to inquire or to discover the facts forming the basis of its claims, or to investigate

the notice of purchaser restrictions in the offering circulars. As acknowledged, jurisprudence

reflects that the Bank's choice to ignore the offering circulars does not toll the limitations

period. *See Carter*, 938 So. 2d at 818-19 (¶¶42-46) (finding that plaintiffs did not establish

the due diligence required to utilize fraudulent concealment to save their time-barred claims

where they received copies of loan documents but did not read them and were not prevented

from reading them); *Frye v. S. Farm Bureau Cas. Ins. Co.*, 915 So. 2d 486, 492 (¶¶20-22)

(Miss. Ct. App. 2005) (finding no due diligence established to toll limitations period as a

matter of law where plaintiffs were furnished insurance policies and would be imputed with

knowledge of their contents, which would have alerted them to the possible existence of their

claims based on endorsement attached to the policies); *Banks v. S. Farm Bur. Cas. Co.*, 912

So. 2d 1094, 1098 (¶15) (Miss. Ct. App. 2005) (finding no fraudulent concealment and thus

plaintiff's lawsuit was time-barred where her insurance policy contained the endorsement that

formed the basis of her lawsuit; even if she had not read her entire policy, knowledge of its

contents was imputed to her as a matter of law); *see also Kravetz*, 941 F. Supp. at 1305

("Plaintiffs' attempt to evade the legal consequences of the offering memoranda, by pleading

ignorance of their contents, runs counter to a substantial body of case law which holds that

34

an investor is charged with knowledge of offering material even if the investor fails to read such material.").

### 3. The Continuing Tort Doctrine

¶58. In several places in its briefing the Bank refers to SSW's "continued and repeated" failure to disclose the purchasing-and-holding eligibility criteria for the Soloso securities. To the extent the Bank is claiming a "continuing tort" so as to toll the limitations period, a review of the applicable law and the record herein reflects no basis for applying that doctrine here. As the Mississippi Supreme Court has succinctly explained: "*A continuing tort sufficient to toll a statute of limitations is occasioned by continual unlawful acts*, *not by continual ill effects from an original violation*." *Stevens v. Lake*, 615 So. 2d 1177, 1183 (Miss. 1993) (quoting C.J.S., *Limitations of Actions* § 177, at 230-31 (1987) (explaining that no continuing tort existed based on an attorney's failure to properly record a trust that resulted in a legal malpractice lawsuit, and the fact that plaintiffs' partnership continued to suffer annual losses stemming from the failure to record the trust did not a create continuing tort)).

¶59. Elaborating on this concept, precedent shows that the Court has explained that a continuing tort requires that the defendant "commit repeated acts of wrongful conduct. . . . [The Court] will not apply the continuing tort doctrine when harm reverberates from one wrongful act or omission." *Smith v. Franklin Custodian Funds Inc*., 726 So. 2d 144, 148-49 (¶17) (Miss. 1998). In *Smith*, the Court held that the continuing tort doctrine failed to toll the limitations period on the investors' negligence claims against Franklin arising from their

investment advisor's use of a forged endorsement to liquidate the securities. *Id.* at 148-49 (¶¶17-18). The Court found in *Smith* that the fact that the investors continued to receive monthly dividends from their advisor (which they believed were from the Franklin fund and other investments) did not constitute a continuing tort. *Id.* at 149 (¶18). In so finding, the Court in *Smith* stated the following:

> The Franklin Funds shares were liquidated in March of 1987. There was no other time at which the Franklin Funds were liquidated. [The investment advisor] may have continued to conceal this act, but there was only one act regarding Franklin Funds. Thus, if the Smiths were injured by Franklin Funds, they were only injured once. Therefore, the Continuing Tort Doctrine does not toll the statute of limitations.

*Id.* Similar to the *Smith* case, the continuing tort doctrine also fails to apply in this case. The Bank purchased the Soloso securities in 2005 and 2007 based on SSW's allegedly negligent recommendations. Thus, if SSW indeed breached its agreement by providing this financial advice and if the Bank was indeed injured thereby, then the law applicable to this case reflects that the last time a breach and injury occurred was in 2007 when the Bank last purchased Soloso securities upon SSW's advice. As in *Smith*, there were no continuing acts of allegedly injurious Soloso purchases after 2007, and therefore the record reflects no evidence of any continuing tort so as to toll the limitations period on these undisputed facts.

## B. The Bank's Mississippi Securities Act Claim

¶60. In this action, the Bank asserts that SSW violated Mississippi securities law, section 75-71-509(b), which is part of the Mississippi Securities Act of 2010 (the "Current Act"), by allegedly soliciting the Bank to buy the Soloso securities without disclosing the purchasing-and-holding eligibility requirements applicable to those securities. However,

36

review of the applicable law reflects that the Bank's claims of violations of the Mississippi Securities Act are time-barred. As set forth in the following analysis, the Mississippi securities-law claims are barred by a two-year statute of limitations and also by a five-year statute of repose. *See* Miss. Code Ann. § 75-71-725 (1981); Miss. Code Ann. § 75-71-701 (Rev. 2016).

¶61. The Current Act became effective on January 1, 2010, replacing the 1981 version of the Mississippi Securities Act ("Predecessor Act"). The Current Act contains the following specific provision establishing a five-year statute of repose relating to claims that existed before passage of the Current Act:

> (a) **Applicability of predecessor act to pending proceedings and existing rights**. The predecessor chapter exclusively governs all actions or proceedings that are pending on January 1, 2010, or may be instituted on the basis of conduct occurring before January 1, 2010, but a civil action may not be maintained to enforce any liability under the predecessor chapter unless instituted within any period of limitation that applied when the cause of action accrued or within five (5) years after January 1, 2010, whichever is earlier.

Miss. Code Ann. § 75-71-701. Thus, the Current Act directs that the Predecessor Act applies to actions based on conduct that occurred before January 1, 2010. We find that the Predecessor Act applies to the Bank's securities act claim herein because the "conduct" on which it is based occurred before 2010, that is, it occurred in 2005 and 2007 when the Bank bought the Soloso securities based on SSW's allegedly negligent recommendations.

¶62. A review of the applicable law provides that any action brought under the Predecessor Act must be instituted by the earlier of (1) the limitations period applicable under the Predecessor Act, or (2) by January 1, 2015, i.e., five years from January 1, 2010. The Bank's

37

securities act claim is time-barred under both provisions.

¶63.    Applying the statutory limitations period, section 75-71-725 under the Predecessor Act is the applicable statute of limitations for actions brought under section 75-71-717(2) (now section 75-71-509(b) under the Current Act).[26] Section 75-71-725 under the Predecessor Act provides that "[n]o action shall be maintained to enforce any liability created under section 75-71-77(2) [for misrepresentations in the sale of securities as alleged herein] unless brought within two (2) years after the discovery of the untrue statement or omission, or after such discovery should have been made by the exercise of reasonable diligence . . . ."  In applying the applicable law as to the "discovery rule" previously addressed, SSW's allegedly negligent or untrue recommendations should have been discovered when the Bank received the offering circulars beginning in 2007, and thus the Bank's securities act claim is time-barred as of 2009 under the limitations period set forth in section 75-71-725 of the Predecessor Act.

¶64.    The five-year statute of repose set forth in section 75-71-701 also extinguishes the Bank's securities act claim because the action was not filed until March 2016, after the January 1, 2015 deadline.  Further, jurisprudence reflects that equitable tolling should not be applied to the statute of repose in this context.  In *California Public Employees' Retirement System v. ANZ Securities Inc*., 137 S. Ct. 2042 (2017), the United States Supreme Court held that equitable tolling would not be applied to the statute of repose applicable to actions

---

[26] Section 75-71-717(a)(2) under the Predecessor Act is the corollary to section 75-71-509(b) of the Current Act.  Section 75-71-717(a)(2) imposes liability on any person who "offers or sells a security by the use of any written or oral communication which contains any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading . . . ."

brought under the Federal Securities Act for material misrepresentations or omissions in a registration statement. The limitations provision discussed in *ANZ Securities* was Title 15 of the United States Code, section 77m, which provided for a one-year discovery rule, coupled with a repose provision requiring that any action must be brought within three years from the public offering.

¶65. In determining that equitable tolling should not be applied, the United States Supreme Court examined the text and structure of the statute and found it relevant that (1) the statute had a two-sentence structure containing a "discovery" rule, followed by a rule of repose; and (2) the "repose" sentence of the statute provided for no exception. *Id.* at 2049-50. As the United States Supreme Court explained, the "discovery" rule in the first sentence allows "leeway to a plaintiff who has not yet learned of a violation," while the rule of repose in the second sentence "protects the defendant from an interminable threat of liability." *Id.* From this the United States Supreme Court held the following:

> [T]he object of a statute of repose, to grant complete peace to defendants, supersedes the application of a tolling rule based in equity. . . . No feature of [15 U.S.C. Section 77m] provides that deviation from its time limit is permissible in a case such as this one. To the contrary, the text, purpose, structure, and history of the statute all disclose the congressional purpose to offer defendants full and final security after three years.

*Id.* at 2052.

¶66. Upon review, we find this same analysis as set forth by the United States Supreme Court in *ANZ Securities* applies here. By reference to the applicable limitations in the Predecessor Act (section 75-71-725 of Mississippi securities law), section 75-71-701 provides for a discovery rule, which is then coupled with the five-year rule of repose.

39

Further, a review of Mississippi statutory provisions shows that the "repose" provision in section 75-71-701, like the federal statute, contains no exception. Finally, even if any tolling doctrine were applied herein, the Bank's securities act claim is still time-barred for all the reasons addressed in the discovery rule, fraudulent concealment, and continuing tort sections above.

¶67. The Bank asserts that the Current Act applies to its securities act claim due to SSW's alleged continued misrepresentations and omissions regarding the Bank's eligibility to purchase the Soloso securities. However, a review of the record and applicable law reflects no merit in this contention. Here, the Bank claims SSW "sold" the Soloso securities "by means of an untrue statement" when, through its financial advice, SSW recommended that the Bank purchase them based on misrepresentations or omissions regarding the Bank's eligibility. These asserted actions constitute the alleged "violations" that form the basis of the Bank's section 75-71-509(b)[27] securities act claim, and the record shows that these acts occurred in 2005 and 2007. For the reasons addressed in the continuing tort section above, an application of jurisprudence to these facts reflects that no new "violation" occurred when SSW furnished the courtesy copies of the offering circulars, or when it made presentations on other trust-preferred securities. *See Smith*, 726 So. 2d at 148-49 (¶17).

¶68. Finally, even if the Bank had properly pleaded and brought a section 75-71-509(b) claim under the Current Act, the law reflects that the claim would still be time-barred. The

---

[27] A "violation" occurs when a "person sells a security . . . by means of an untrue statement of a material fact or an omission to state a material fact . . . ." Miss. Code Ann. § 75-71-509(b).

limitations provision under the Current Act is found in section 75-71-509(j)(2). It provides, in pertinent part, that "[a] person may not obtain relief . . . [u]nder subsection (b) . . . unless the action is instituted within the earlier of two (2) years after discovery of the facts constituting the violation or five (5) years after the violation." As noted, the relevant "violations" occurred in 2005 and 2007. Under the "repose" rule in this statute, the Bank's claim is time-barred because it was required to bring its securities act claim within 5 years of the "violation" (i.e., by 2012 at the latest).

¶69. Applying the two-year "discovery" portion of section 75-71-509(j) sets an even earlier deadline of 2009 in accordance with the discovery rule as applied to this case. The record reflects that even though SSW was not the dealer or issuer of the securities at issue, SSW provided the offering circulars as a courtesy on six occasions, beginning in 2007. The record supports the circuit court's determination that the Bank's Mississippi Securities Act claim is time-barred by the statutes of limitations and repose; by 2007 the offering circulars put the Bank on notice to discover any alleged misrepresentations/omissions or violation under section 75-71-509(b) as to the purchaser-eligibility requirements, and thus the Bank was required to file any securities act claim by 2009. The Bank's complaint was filed in March 2016, well outside the two-year limitations period and the five-year rule of repose. The Bank's securities act claim is time-barred under any analysis.

¶70. Based upon the foregoing, we affirm the circuit court's grant of summary judgment on the ground that the Bank's claims are barred by the applicable statutes of limitations and repose.

41

## II.    The Bank's Claims on the Merits

¶71.    The essential premise of all of the Bank's claims against SSW is that, as a matter of federal securities law, it was categorically illegal for the Bank to purchase and hold the Soloso securities.  Proceeding from this premise, the Bank alleges that SSW breached its fiduciary duty to the Bank, misrepresented or omitted material facts, and violated the Mississippi Securities Act when it advised the Bank to purchase the Soloso securities.  However, the record does not show that it was, in fact, illegal for the Bank to purchase or hold Soloso securities; nor does the record show that any alleged ICA violation by the issuers impaired the value of the Soloso securities as to the Bank.  We therefore also affirm the circuit court's order granting summary judgment on this basis.

¶72.    As an initial matter, it is important to understand that the illegality that the Bank alleges has nothing to do with the Bank's losses.  The securities at issue are CDOs backed by trust-preferred securities issued by bank holding companies.[28]  These securities were issued in several classes or "tranches," each with its own rights with respect to rates of return and repayment of principal in the event of a default. Senior noteholders received a lower rate of return but more security in the event of a default, while junior noteholders received a higher rate of return but less security in the event of a default.  The Bank is a junior noteholder.  The Bank purchased the securities in 2005 and 2007.  The securities subsequently decreased in value, and the Bank alleges that the securities are now

---

[28] For a more detailed discussion of the securities, see *Lansuppe Feeder LLC v. Wells Fargo Bank*, No. 15-CV-7034-LTS, 2016 WL 5477741 (S.D.N.Y. Sept. 29, 2016), *appeal pending*, No. 16-4061 (2d Cir. filed Dec. 2, 2016), which is a case involving claims by other Mississippi banks regarding the same securities.

"worthless," apparently default rates in the underlying collateral were substantially higher than anticipated; which is why the Bank experienced a loss on the investment—not because its alleged lack of qualifications to own the securities. It is also important to note that the Bank's own investment and asset/liability management policy authorized it to own securities of this nature, and the Bank purchased similar CDOs issued by other entities during the same time period.

¶73.   The 2005 offering circular for the Soloso securities stated in part:

> The Notes have not been registered under the Securities Act nor has either of the co-issuers been registered under the Investment Company Act. The Notes may not be offered or sold within the United States or to U.S. persons . . . except to "Qualified Institutional Buyers" (as defined in Rule 144A under the Securities Act) or "Accredited Investors" (as defined in Rule 501(a) under the Securities Act) . . . . The Notes may not be offered or sold within the United States or to U.S. persons except to "Qualified Purchasers" (within the meaning of section 3(c)(7) of the Investment Company Act) in a transaction that does not cause either of the co-issuers to be required to register under the Investment Company Act.

(Capitalization omitted).[29]

¶74.   In this case, the Bank initially argued that it was illegal for it to purchase or own the Soloso securities because the Bank is not a QIB. However, the Bank *is* an "accredited investor."[30] As noted above, under federal law, "accredited investor" is defined to include

---

[29] There is similar language at various other places in the 2005 and 2007 offering circulars.

[30] The Bank correctly states that it is not a QIB because it does not own and invest at least $100 million in securities issued by unaffiliated entities. *See* 17 C.F.R. § 230.144A(a)(1)(i) & (vi). "Because of this asset requirement [qualified institutional buyers] invariably are accredited investors, but the converse is not true." Jonathan D. Glater, *Private Offerings and Public Ends: Reconsidering the Regime for Classification of Investors Under the Securities Act of 1933*, 48 Conn. L. Rev. 355, 373 (2015).

"[a]ny bank as defined in section 3(a)(2) of the [Securities] Act," 17 C.F.R. § 230.501(a), which includes "any national bank, or banking institution organized under the laws of any State . . . , the business of which is substantially confined to banking and is supervised by the State . . . banking commission or similar official."  15 U.S.C. § 77c(a)(2).  There is no dispute that this definition covers the Bank.

¶75.    Because the Bank is not a qualified institutional buyer, the Bank is correct that resales of the Soloso securities from the "initial purchasers," Bear Steams & Co. and SunTrust Capitol Markets Inc.,[31] to the Bank were not exempt from registration under the Securities Act under Rule 144A.  *See* 17 C.F.R. § 230.144A(d)(1).  However, "[a]ttempted compliance with [Rule 144A] does not act as an exclusive election," and any seller who relies in part on Rule 144A "may also claim the availability of any other applicable exemption from the registration requirements of the [Securities] Act."  *Id.* § 230.144A, preliminary note 2.

¶76.    The apparent intent of the offering circulars at issue in this case was to permit resales from the initial purchasers to accredited investors in reliance on both Rule 144A and what is known as the "Section 4(1½) Exemption."  *See* Rutherford B. Campbell Jr., *Resales of Securities under the Securities Act of 1933*, 52 Wash. & Lee L. Rev. 1333, 1345-46 (1995); William K. Sjostrom, Jr., *The Birth of Rule 144A Equity Offerings*, 56 UCLA L. Rev. 409, 420, 444 (2008); Thomas Lee Hazen, *Federal Securities Law* § 3.D.2.c, at pp. 51-52 (3d ed. 2011).  "Although not formally codified by the SEC," this "exemption finds support in SEC

---

[31] As the initial purchasers, Bear Stearns and SunTrust played a role akin to the traditional role of an underwriter.  However, assuming that they complied with the relevant exemptions from the registration requirements of the Securities Act, they are not considered underwriters for purposes of the Act.  *See infra*.

44

no-action letters, interpretive releases, judicial decisions, and commentators' writings." Hazen, *supra*, at pp. 51-52. "[R]esales pursuant to the section 4(1½) exemption must meet the same criteria applied to sales by an issuer under the private placement exemption of section 4(2) [of the Securities Act, 15 U.S.C. § 77d(a)(2)]."[32] Ruthford B. Campbell Jr., *The Plight of Small Issuers (and Others) Under Regulation D: Those Nagging Problems that Need Attention*, 74 Ky. L.J. 127, 148 (1985). Section 4(2), as implemented by the "safe harbor" of Rule 506 of Regulation D, 'permits sales to accredited investors subject to certain conditions and limitations. *See* 17 C.F.R. § 230.506 (2005);[33] *see also* 17 C.F.R. § 230.501(e)(iv) (2005) (providing that accredited investors are not counted towards limitation on the number of purchasers under Rule 506).

¶77. On the summary judgment record, it is apparent that the issuer and initial purchasers attempted to satisfy exemptions from registration under the Securities Act by restricting resales of the Soloso securities to qualified institutional buyers *and other accredited investors*. In addition, there is no evidence that the Soloso securities were sold in a manner that would have required registration *under the Securities Act*.

¶78. Nonetheless, the Bank secondarily argues that it was illegal for it to purchase and own the Soloso securities even if there was no violation of the Securities Act. This is so, the Bank says, because the securities were resold to the Bank in violation of the ICA. The Bank points to language in the offering circular, quoted above, that restricted sales to "qualified

---

[32] Section 4(2) is also referred to as section 4(a)(2).

[33] Rule 506 has been amended subsequent to the transactions at issue in this case.

45

purchasers," and the Bank argues that it is not a qualified purchaser under the ICA.[34] The offering circular apparently restricted sales to "qualified purchasers" so that the issuers of the Soloso securities[35] would not be required to register as investment companies under the ICA.

¶79. In response, SSW maintains that "registration requirements and exemptions under the ICA have nothing whatsoever to do with whether securities transactions/sales of securities qualify for an exemption to the registration requirements of the Securities Act." SSW argues that the question whether the Bank was a "qualified purchaser" only related to whether the issuers were required to register as investment companies under the ICA—not the legality of the Bank's purchases or continued ownership of the Soloso securities. On this issue, the Court agrees with SSW.

¶80. The United States District Court for the Southern District of New York has held that transactions involving an unregistered investment company "are not void, but merely voidable." *Avnet Inc. v. Scope Indus.*, 499 F. Supp. 1121, 1127 (S.D.N.Y. 1980). "[A]t most, [such transactions] may be subject to rescission, and then presumably at the option of the [party that is not in violation of the ICA]." *Id.* If anything, a failure to register under the ICA may confer a right of rescission. *See id.* An unregistered investment company's violation of the ICA's registration requirements would not render it illegal for any other entity to hold the relevant securities. Nor would such a violation, in and of itself, impair the

[34] As relevant here, a qualified purchaser includes an entity that "in the aggregate owns and invests on a discretionary basis, not less than $25,000,000 in investments." 15 U.S.C. § 80a-2(a)(51)(A)(iv). The Bank alleges that it does not satisfy this requirement.

[35] The issuers were Soloso CDO 2005-1 LTD and Soloso CDO 2007-1 LTD.

46

value of the securities to the holder.

¶81. Thus, even if the issuers in this case violated the ICA by failing to register as investment companies, their violation of the ICA did not render it illegal for the Bank to purchase or hold the Soloso securities. Indeed, the Bank still holds the securities to this day. The Bank alleges that the securities are now worthless, but as discussed above, the securities' present value has nothing to do with the applicability or non-applicability of any exemption from registration under the ICA. Moreover, the Bank identifies no provision of federal law that would indicate that the issuers' alleged failure to register under the ICA[36] has impaired the value of the securities to the Bank. At most, that violation may have allowed the Bank some right of rescission against the issuers.[37]

¶82. Accordingly, we affirm the circuit court's order granting summary judgment because the Bank has not shown (1) that it is unlawful for the Bank to purchase or hold the Soloso securities or (2) that the issuers' alleged violation of the ICA impaired the value of the securities to the Bank. For these reasons, the Bank cannot succeed on its claims that SSW breached a fiduciary duty, misstated or omitted a material fact, or violated the Mississippi Securities Act. We affirm summary judgment on this additional basis.

¶83. **AFFIRMED.**

---

[36] We may assume for purposes of this appeal that the issuers did violate the ICA.

[37] Indeed, apparently similarly situated banks asserted such a claim for rescission in federal litigation involving the same securities. The district court denied such relief, in part because the court concluded that it would be inequitable to senior noteholders to allow the junior noteholders (the banks) to undo the transactions. *See Lansuppe Feeder*, 2016 WL 5477741, at *5. As noted above, the district court's ruling is pending on appeal.

**IRVING, P.J., BARNES, GREENLEE, WESTBROOKS AND TINDELL, JJ., CONCUR. LEE, C.J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION. WILSON, J., CONCURS IN PART AND IN THE RESULT WITH SEPARATE WRITTEN OPINION, JOINED IN PART BY TINDELL, J. GRIFFIS, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY FAIR, J.**

**WILSON, J., CONCURRING IN PART AND IN RESULT:**

¶84. I concur in the result and in Part II of the majority opinion (¶¶71-82) only.

¶85. Like the dissent, I do not join any part of the majority's discussion of the statutes of limitations. However, that is only one of several grounds on which SSW moved for summary judgment. The basic premise of all of the Bank's claims is that it was categorically illegal for the Bank to purchase or hold the Soloso securities. If that premise is incorrect as a matter of law, then the Bank's claims fail as a matter of law. I concur with Part II of the majority opinion, which affirms the circuit court's order granting summary judgment because the Bank has not shown (1) that it is unlawful for the Bank to purchase or hold the Soloso securities or (2) that the issuers' alleged violation of the Investment Company Act impaired the value of the securities to the Bank. This is an independent and sufficient basis on which to affirm the circuit court's order granting summary judgment. That is, SSW was entitled to summary judgment on this ground even if there are genuine issues of material fact with respect to the statutes of limitations.

¶86. In an appeal from an order granting summary judgment, the appellee is "entitled to raise any alternative ground based on the pleadings in the court below which would support the judgment." *Brocato v. Miss. Publishers Corp.*, 503 So. 2d 241, 244 (Miss. 1987). The dissent may be correct that there are genuine issues of material fact as to the statutes of

48

limitations; however, the dissent fails to address the independent, alternative ground for affirmance discussed in Part II of the majority opinion.

**TINDELL, J., JOINS THIS OPINION IN PART.**

**GRIFFIS, P.J., DISSENTING:**

¶87. The question before us is whether SSW is entitled to a summary judgment on the basis of its statute of limitations defense. We review the grant or denial of a motion for summary judgment de novo, viewing the evidence "in the light most favorable to the party against whom the motion has been made." *Karpinsky v. Am. Nat'l Ins. Co.*, 109 So. 3d 84, 88 (¶9) (Miss. 2013). SSW, as the movant, bears the burden of persuading this court that: "(1) no genuine issue of material fact exists, and (2) on the basis of the facts established, he is entitled to judgment as a matter of law." *Id*. at (¶11).

¶88. In my opinion, we must only decide whether there are any genuine issues of material fact in dispute and whether SSW is entitled to a judgment as a matter of law. M.R.C.P. 56(c). In *Weathers v. Metro. Life Ins. Co.*, 14 So. 3d 688 (Miss. 2009), the supreme court ruled:

> This Court has held that a cause of action accrues when it comes into existence as an enforceable claim, that is, when the right to sue becomes vested. In other words, the statute of limitations begins to run when all the elements of a tort, or cause of action, are present. Under Section 15-1-49, *the statute of limitations commences upon discovery of an injury, and discovery is an issue of fact to be decided by a jury when there is a genuine dispute*. Therefore, the critical question with which we are confronted is whether, in a summary judgment context, we can identify as a matter of law, the point at which Weathers knew or should have known or should have made an inquiry, based on the information available to him.

*Id.* at 692 (¶14) (emphasis added) (citation and internal quotation mark omitted). The court

49

further held:

> After careful consideration of the record and viewing it in the light most favorable to Weathers, we conclude that the "triggering event cannot be pinpointed as matter of law, but poses a question of fact as to when a reasonable policy holder should have realized from the available information that the policy would not or was not performing as allegedly promised and that the so-called vanishing premiums were a fiction."

*Id.* at 694 (¶22). Consistent with *Weathers*, I have considered the record and viewed it in the light most favorable to the Bank, and I conclude that, in this case, there is an issue of fact that must be determined by a jury. Here, the "triggering event cannot be pinpointed as matter of law, but poses a question of fact as to when a reasonable [Bank] should have realized from the available information that" SSW had committed the wrongful act. *Id.* It is clear to me that there is a factual dispute as to when the Bank learned or should have learned of SSW's wrongful conduct.

¶89. The Bank and SSW entered a contractual relationship where SSW agreed to serve as the Bank's investment advisor and provide the Bank with investment advice that SSW "determine[d] to be appropriate . . . ." Based on this relationship, SSW advised the Bank to purchase Soloso securities in 2005 and 2007. The Bank had reason to rely on SSW's advice and recommendation to understand that it was qualified and a proper institution to purchase these securities. The Bank relied upon the investment advice of SSW to purchase the securities.

¶90. The question here is when did the Bank know or should the Bank have known that it was not a qualified purchaser of these securities. The trial court determined that summary judgment was appropriate based on the expiration of the statute of limitations.

¶91. SSW's argument that the Bank's claims are time-barred relies on offering circulars that SSW says were furnished to the Bank in 2007. SSW asserts that the circulars put the Bank on notice of the legal requirements for making the investments. However, it appears the circulars were furnished to the Bank *after* SSW recommended the investments and the Bank purchased the investments. There is certainly no evidence that the circulars were provided prior to the Bank's purchase of the investments.

¶92. In addition, in the December 2014 email, SSW informed the Bank of its non-qualified purchaser status and identified the options to salvage the purchased investments. Now SSW denies that the Bank was unqualified to purchase the securities at issue. Instead, SSW argues that the Bank should have known in 2007 of its non-qualified purchaser status, but it maintains that the Bank is qualified.

¶93. The Bank offered evidence to show there was a genuine issue of a material fact in dispute. The Bank offered evidence that it was not a qualified purchaser of the Soloso securities, it *never received* an offering circular for any of the Soloso securities prior to the purchases, and the first time it learned that it was not a qualified purchaser was when SSW sent an email to the Bank advising it of this fact in December 2014. Thus, the Bank argues that it filed its complaint timely.

¶94. The Bank takes the position that the following material facts preclude summary judgment: (a) as the Bank's registered investment advisor, SSW owed a fiduciary duty to provide a "full and fair disclosure of all material facts" regarding Soloso; (b) SSW never disclosed the legal requirements to purchase or hold those securities, much less that the Bank

51

did not meet those requirements; and (c) the Bank did not learn that it was not legally eligible to purchase or hold those investments until December 2014, less than two years prior to the instant lawsuit.

¶95.    I am of the opinion that there is a genuine issue of a material fact in dispute as to when the statute of limitations began to run and that SSW is not entitled to a judgment as a matter of law.  Accordingly, I respectfully dissent.  I would reverse and remand this case for further proceedings.

**FAIR, J., JOINS THIS OPINION.**